Argued April 11; affirmed April 25; rehearing denied May 16, 1944

# STATE *v.* LAYTON
(148 P. (2d) 522)

Before Bailey, Chief Justice, and Belt, Rossman, Kelly, Lusk, Brand and Hay, Associate Justices.

*Roy R. Hewitt,* of Salem, and *Harry G. Hoy,* of Portland, for appellant.

*Bruce Spaulding,* of Salem, and *R. S. Kreason,* of Dallas, for respondent.

KELLY, J.

The indictment charges that the defendant, in an attempt to commit rape, killed Ruth Hildebrand. The jury made no recommendation of leniency and hence sentence of death was imposed.

On the morning of June 8, the day after Miss Hildebrand was drowned, Miss Doris Hardesty, while in the company of two of her playmates, found on the bank of the river near the scene of the drowning, some three or four feet from the water's edge, a half

of a brassiere; but the first public notice of the death of Ruth Hildebrand came when her body was found lodged against a boom log in the Willamette River near the place where she and the defendant were when she met her death. The discovery of the body occurred on the evening of June 20, 1943. Mr. Aden Elmo Hardesty, of Independence, Mr. John Roth, of Lebanon and Mr. Beryl Bagley, of Portland, observed the body while they were fishing from a rowboat. The body was nude except for an anklet or stocking on one foot. The body was very bloated and badly decomposed.

An investigation by the state police officers indicated that the defendant was with her when she met her death. At the time this investigation was made, defendant was incarcerated in the county jail at Hillsboro, in Washington County, under a sentence of imprisonment for six months.

On July 7, 1943, the defendant was taken by the state police officers from the county jail at Hillsboro to the state police office at Milwaukie, near Portland, where they arrived at about 2:30 o'clock in the afternoon. Defendant was seated in the outer office where he remained until approximately 3:30 P. M. The officers then took the defendant into a private office and questioned him from 3:30 until approximately 6:10 in the evening. Defendant was then taken by the officers to a restaurant for dinner. Upon their return to the police office at about 7:10 P. M., the questioning of defendant was resumed and continued until 10:15 P. M. From 7:30 to 10:15 P. M., a stenographic reporter, employed by the police department, was present and took stenographic notes of the questions then propounded to and answers given by the defendant. From 10:15 P. M. of July 7, 1943, until approximately

4:00 o'clock A. M. of July 8, 1943, defendant occupied a chair in the outer office where for a part of the time he was asleep.

At approximately 4:00 A. M. July 8, 1943, defendant was again taken into the private office and further questioned by the officers concerning his connection with Ruth Hildebrand's death. This questioning continued until about 6:30 or 7:00 o'clock on July 8th. At about 7:13 A. M. the stenographer returned and again engaged in taking shorthand notes of the questions asked by the officers and answers thereto given by defendant. The taking of notes by the stenographer was concluded at about 8:15 A. M. of July 8th.

The defendant, the officers and the stenographer then repaired to a restaurant for breakfast. Upon their return to the police office the stenographer began transcribing her notes which she completed at about 11:20 A. M. The statements were signed by defendant at approximately 11:50 A. M. July 8, and defendant was then returned to the Washington County jail.

The first extended account given by defendant of his relations with Miss Hildebrand is repellent. The later account is revolting. In any view this case is sordid and one can only regret that clean paper must be soiled by having the imprint thereon of such a record.

The first response defendant made with reference to Miss Hildebrand, when interviewed by the police officers, was to the effect that he did not know her. In other words, it was a disclaimer of any acquaintanceship.

The first extended account, however, given by defendant was to the effect that on a few occasions prior to June 7, 1943, he had taken her in his car

from Monmouth to her home at Independence. At times she was accompanied on these trips by others and on at least one occasion she was alone with him.

On the night of June 7, 1943, sometime after 11 P. M., defendant saw Miss Hildebrand in Monmouth seeking a ride to her home. He was in his automobile at the time and stopped to talk with her. She got into the car with him. They went to Independence to procure some beer. There they found the beer parlors closed and then went south from Independence to find a bootlegger. About six miles south of Independence, they stopped at a place along the river bank known as Wells Landing, which was an abandoned log dump where rubbish also had been thrown. There they engaged in amorous manifestations toward each other, and agreed to have sexual intercourse. Miss Hildebrand, so defendant said, climbed from the front seat of the car to the rear seat; but defendant told her that there was not room enough there for their purpose, whereupon they got out of the car, spread a blanket upon the ground, disrobed and engaged in sexual intercourse. Then, while in the state of nudity, they engaged in the game of tag and as she ran toward him, he dodged, and she ran or fell over the bank of the river into the water and was drowned. He then went down to the water, put his foot into it and decided there was nothing he could do to rescue her. He then returned to the place where the clothing was, put on his clothing, and threw her clothing into the river. Then he got into his automobile, went a short distance, got out and pumped up a leaky tire and then went home.

Upon the trial in the circuit court, while testifying before the jury, the defendant repeated practically the

same account as that first reported by the stenographer at the State Police Office. The stenographer's transcript of this first extended statement signed by defendant is known to this record as State's Exhibit No. 17.

When defendant gave his later statement, he told the officers that upon arriving at Well's Landing he attempted to have intercourse with Miss Hildebrand; that she was unwilling and tried to get away from him by crawling over the back of the front seat into the rear seat and out the back door of the car on the right hand side, but finally he was able to engage in intercourse with her partly through persuasion and partly through force; that the girl was dressed at the time. Defendant further said that after that act of intercourse was completed, he let her up and as she got up he grabbed her coat. She jerked her arm loose from the coat and it came off. Then he reached and grabbed her skirt which came unfastened and she kicked herself loose from her skirt. At that point in his statement he said: "I wanted another piece." The officer then asked: "By 'piece' you mean another intercourse with Ruth Hildebrand?" To this question, defendant answered "Yes".

Defendant was asked: "Did you grab her again?" He answered: "Yes, I grabbed her pants and tore them from her. She broke away from me and started down this trail towards the river which is just a short distance."

The following is quoted further from defendant's second extended statement to the officers as transcribed by the stenographer:

"Q Was she still running, or did you have a hold of her?

A When she went down the bank, that was when I got hold of her again. I grabbed her brassiere and tore that off. I grabbed it with my left hand between the breasts and about the same time I hit her in the face with my right hand and as I hit her, the brassiere tore in two and she fell over backwards into the water.

By Sergeant Hatfield:

Q Did you strike her in the face or on the side of the face?

A I think the blow struck on the side of her face.

By Lieutenant Howard:

Q Did you hear her holler when she went in the water?

A I thought I did. I was nervous.

Q Were you able at this time to reach down and grab hold of her?

A She went down right away. It was dark.

Q How did you know she went down?

A I thought she screamed.

Q What did she say?

A She hollered 'help' weak like.

Q Did you think you heard her scream more than once?

A I thought I heard her once.

Q What did you do then?

A I started in the water then. I am afraid of water. I didn't know what to do then. I started back up the bank and picked up half a brassiere and threw it in the water, then went to the top of the trail, picked up the pants and threw them in the brush towards the river. I then walked back to where the blanket was where I had had intercourse with her, and here I picked up her jacket, blouse and skirt and her shoes, which she had wrestled off when her skirt came off. She just had slippers on. I then walked back down to the top of the bank and tossed them towards the river. Then I got to thinking

they didn't go in the river so I went down the bank, struck a match and found the coat, blouse and shoes and skirt were not in the river, so I again picked up all these articles and this time I threw them directly in the river near the place where Ruth Hildebrand fell in. There is a big tree there, I think.

Q On which side of the tree did you throw them in the river?

A To the north of the tree where Ruth fell in.

Q You mention picking up the blouse. I don't believe any mention was made as to when the blouse came off.

A It came off when I had her down having intercourse with her. I unbuttoned her blouse, which buttoned down the front, and was playing with her breasts, and when her coat came loose her blouse came off at the same time.

Q During the time she was getting up from the blanket and lost the various articles of clothing which you have described as having torn from her, did she scream?

A She didn't holler.

Q Did she do any talking?

A She said: 'don't do that.'

Q Did she ask you more than once not to do that?

A Yes, she asked me a couple of times.

Q What did you tell her?

A I didn't say anything to her. I just kept right on.

Q How do you account for your actions at this time?

A I just wanted a piece of tail.''

While there are eleven assignments of error presented in defendant's brief, three points were stressed in the oral arguments by defendant's attorney.

First. That defendant's alleged defective mentality absolved him from being amenable to criminal prosecution.

Second. The alleged coercive manner in which his confession was secured, particularly, in the light of his alleged subnormal mentality, rendered such confession inadmissible; and

Third. That there is no corroboration of defendant's statement showing that the crime charged was committed.

■ Ever since 1884, when the case of *State v. Murray*, [11 Or. 413, 5 P. 55] was decided, to and including *State v. Wallace,* decided in 1942, [170 Or. 60, 131 P. (2d) 222] the test for determining legal responsibility in Oregon has been announced substantially as follows: If at the time of committing an act, the party was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know the nature and quality thereof that he did not know that he was doing what was wrong, he should not be held responsible under the criminal law. In a word, this state is committed to the right and wrong test.

■ Moreover, the defense of insanity is one upon which defendant holds the affirmative and in order to avail defendant, it must be proven to the satisfaction of the jury beyond a reasonable doubt.

The trial judge instructed the jury in conformance with these principles of law.

Dr. Herman A. Dickel, a physician and surgeon of Portland, Oregon, who specializes in neuropsychiatry, nerves and mental diseases, testified in behalf of de-

fendant, and we quote from his cross-examination as follows:

"Q Doctor, do I understand you to claim that this man Layton doesn't know the difference between right and wrong?

A I don't think I made that particular statement.

Q No, I am asking you what you say about that.

A I said that he is unable to understand or appreciate the nature, the extent and the effect of any particular act.

Q Would you tell me whether or not in your opinion the defendant Layton on the 7th—night of the 7th or the early morning of the 8th of June, would have known that it was wrong to have chased a girl who was trying to escape from him, to have torn her clothing from her, and to have knocked her in a river where she drowned? Will you tell me if you have an opinion as to whether or not he would know that it was wrong?

A I think he would have enough intellectual capacity to know that some particular act might be wrong, but to be able to carry through and know what the outcome of that particular act would be, I don't think he has the capacity for that.

Q But you think he does have the capacity to know that was wrong in itself, regardless of what the outcome might be?

A Yes.

Q In other words, you think that if there had been a policeman shown up on the scene there while he was chasing the girl, if he did, that he might have changed his course and discontinued doing what he was doing?

A I think that he would have done—he would have changed his course regardless of who showed up, as long as some one showed up.

Q You think he knows the difference between right and wrong in other matters besides that? For instance, he would know that it is wrong to steal, and it is wrong to burn houses down, and it is wrong to do crimes in general, would he not?

A He would be able to know what wrong acts were and what right acts were."

Defendant was employed as Chief of Police of Monmouth for about two months beginning about the first of January, 1943. It was while he was so employed that Miss Hildebrand first met him. Defendant also served as City Marshal of Sweet Home for about a month and a half beginning on or about April 1, 1943.

Dr. F. R. Bowersox, Mayor of Monmouth, was called as a witness in behalf of defendant.

We quote as follows from the cross-examination of Dr. Bowersox:

"Q Doctor, his — the objections to him as a police officer were not so great that you ever discharged him, were they?

A No sir.

Q And you kept him on as police officer until he resigned himself, isn't that right?

A Yes, sir.

Q Now, to whom did he apply when he got his job?

A To me.

Q And did you interview him as to his qualifications?

A Simply as to his willingness to take the place.

Q Well you, — I assume — considered in your own mind as to whether or not he was qualified for the job, did you not?

A Yes, sir.

Q And I understand that you are a duly licensed and practicing physician and surgeon in Oregon?

A Yes, sir.

Q How long have you been a licensed physician and surgeon?

A Since April, 1940—1900, 43 years.

Q 43 years, last April?

A Yes.

Q And you have practiced your profession, have you not? in Monmouth for a good many years?

A Since 1909.

Q And how long have you been Mayor of Monmouth?

A 13 years. This is my 13th year.

Q And I suppose a good many times while—during your term as Mayor, you have interviewed and employed police officers?

A Yes, sir.

Q And after your interview with this defendant, you employed him as a chief of police of Monmouth?

A Yes, sir.

Q And you say that he did use good judgment.

A Yes, sir. He did what we requested him to do.

Q And some people didn't like to be arrested because they didn't completely stop?

A That is right.

Q They were supposed to completely stop there, aren't they?

A Yes, sir.

Q That is the city ordinance?

A The state requires it.

Q You have a city ordinance on it, too, don't you?

A I don't believe we have on stop signs.

Q Anyway, it is the law?

A Yes, sir.

Q And he understood it?

A Yes, sir.''

Dr. John C. Evans, Superintendent of the Oregon State Hospital, was called as a witness in behalf of the state and testified that, in his opinion, defendant was not mentally sick nor definitely feeble-minded, and that he is responsible for his actions.

Dr. A. B. Starbuck, of Dallas, Oregon, who has been a general practitioner of medicine and surgery for the last twenty or twenty-five years, was also called as a witness in behalf of the state and testified that he was present while Dr. Evans was examining defendant and that he concurred in Dr. Evans' diagnosis. Dr. Starbuck also testified that in his opinion defendant had the capacity to know the difference between right and wrong.

■ The finding of the jury, which has the effect of holding defendant amenable to punishment as a person endowed with mental capacity enabling him to know the nature and quality of the act he was doing and to distinguish between right and wrong, is supported by the record in this case.

■ As to the admissibility of defendant's confession, it must be borne in mind that when this confession was offered, the trial court in the absence of the jury conducted an inquiry preliminary to its admission; and at the conclusion of such inquiry the trial court overruled defendant's objection and held in effect that the confession of defendant was obtained without the influence of hope or fear. Under those circumstances, the determination of the trial court will not be disturbed unless there is clear and manifest error. *State v. Blodgett,* 50 Or. 329, 92 P. 820; *State v. Spanos,* 66 Or. 118, 120, 134 P. 6; *State v. Morris,* 83 Or. 429, 440, 163 P. 567; *State v. Stevenson,* 98 Or. 285, 193 P. 1030, and authorities there cited.

■ As stated, defendant was in the custody of the officers when his confession was made; but this fact does not render the confession any the less admissible. *State v. Stevenson,* supra, and authorities there cited. *State v. McPherson,* 70 Or. 371, 141 P. 1018; *State v. Scott,* 63 Or. 444, 128 P. 441, and cases there cited.

■ The fact that defendant was without legal counsel, while being questioned by the officers, does not render his statement inadmissible.

■ Complaint is made because defendant spent the night in a chair rather than a bed; but in the light of the fact that defendant is a large, healthy and comparatively young man; and that for two months, during January and February, 1943, as Chief of Police of Monmouth, he was on duty from 1 P. M. of one day until 5 A. M. of the next; that as City Marshal of Sweet Home for a month and a half beginning in April, 1943, defendant was on duty during the night, and about ten years before that defendant worked nights as a flagman for the State Highway Commission, it could not be said that he was unaccustomed to spending nights awake.

The record fails to indicate that at any time during his contact with the state police officers defendant asked to be given a bed upon which to rest. We are unable to conclude that the trial court erred in receiving defendant's confession.

We are not unmindful that defendant called the officers' attention to a painful tooth while he was at the police office; but a careful consideration of the record discloses that defendant's aching tooth was not effective or influential in causing defendant to make the last extended statement to them which comprises

the confession known to this record as State's Exhibit No. 16.

■ The action of the Washington County authorities in permitting defendant to be taken from the Hillsboro jail to Milwaukie, Oregon, for questioning is the subject of some animadversion by defendant's attorneys, which would not have been forthcoming if the questioning had been conducted at the Hillsboro jail, however, nothing is shown to have occurred in transit between Hillsboro and Milwaukie that had the slightest tendency to influence defendant either by inducement or fear to confess to the commission of the crime of which, under this record, he stands convicted.

We find no error on the part of the trial court in receiving State's Exhibit No. 16 in evidence.

The statute provides that defendant's confession only is not sufficient to warrant his conviction without some other proof that the crime has been committed.

It is urged by defendant's counsel that the record is barren of any proof other than defendant's confession that the crime of murder while attempting to commit rape was committed.

Defendant's testimony, as a witness in his own behalf, eliminates the possibility of ascribing Miss Hildebrand's death to the action of any one other than himself. By that testimony, he establishes the repulsive fact that he was intensively amorous toward her. He was thirty-six years old, she was not yet eighteen. His weight was approximately 225 pounds. Miss Hildebrand was but five feet four and a half inches tall and weighed approximately one hundred pounds less than the defendant. He had been twice married, and was then the husband of another woman.

Instead of according to this high-school girl the protection to which she was entitled at his hands, instead of remembering and observing his own marital vows, he took the course of a Lothario and a licentious rake. In other words, he permitted his lechery to mark the course of his conduct.

The jury were warranted in concluding that the torn garments, found near the place where admittedly Miss Hildebrand lost her life, were those worn by her. Defendant's testimony on the stand discloses that Miss Hildebrand and he were the only persons present then. The conclusion is inescapable that either he, the defendant, tore the brassiere from her breast or Miss Hildebrand did so herself. The same thing may be said of the panties torn from her and stained by blood and semen. It is well established by the record that Miss Hildebrand was an experienced swimmer. There is no evidence that when she fell into the water she was incapacitated in any way except by the force which caused her to fall. The jury could infer from the evidence that the defendant stunned her temporarily by a blow causing her thus to fall, and thereby preventing her from swimming to safety.

The defendant's testimony is to the effect that after her fall into the water he threw her clothing into the river which certainly is strong evidence of an attempt to conceal the evidence of an appalling crime. For twelve days the defendant remained mute and silent with respect to the death of Ruth Hildebrand known only to himself. It was through no act of his that her body was found; and not until then were his lips unsealed as to the cause of her death.

The jury were warranted in finding from other proof than defendant's confession that after once

violating the person of his victim, a high-school girl, while the desire for further sexual gratification was still upon him and the girl herself was resisting his further advances to the extent of her ability, defendant applied sufficient force to stun her to the extent of preventing her to use her powers as a swimmer in saving her life, and in doing so defendant caused the girl to fall into the river and drown.

As stated, eleven assignments of error are presented by defendant.

The first of these assignments is predicated upon the denial of defendant's motion for change of venue.

■ No unusual difficulty was experienced in securing a jury. The defendant exercised but eight of his twelve peremptory challenges. Under these circumstances, no error is shown in the denial of defendant's motion for a change of venue.

■ It is universally held that a change of venue is discretionary with the trial court. *State v. Caseday,* 58 Or. 429, 115 P. 287, and authorities there cited. No abuse of discretion is shown in this record in denying defendant's motion for a change of venue.

■ The second assignment of error is based upon the denial by the trial court of defendant's challenge of cause of jurors. Cecil Riggs and Ben Johnson, on their *voir dire.* These gentlemen were peremptorily challenged by defendant. If any error was committed, it was cured by the exercise of the peremptory challenges. *State v. Humphrey,* 63 Or. 540, 128 P. 824; *Twitchell v. Thompson,* 78 Or. 285, 289, 153 P. 45.

■ The third assignment of error is based upon the admission in evidence of seven enlarged photographs of the scene of the alleged crime and its vicinity. Defendant argued that because a view of the premises

was had by the jury, the reception of the photographs but cluttered and encumbered the record. This overlooks the rule that the view taken by the jury does not constitute evidence, but is a means of enabling the jury to more easily and accurately understand the testimony. No error was committed by receiving these pictures in evidence.

■ The fourth assignment of error is based upon the action of the trial court in permitting Dr. Beeman to be recalled for the purpose of explaining how two holes were caused to be made in said Exhibit No. 13. Dr. Beeman, having testified that he had made an analysis of the stains on State's Exhibit No. 13, was recalled on rebuttal and by permission of the court testified that the holes appearing in said exhibit were made when the doctor cut pieces therefrom with which to make such analysis. Permitting the doctor thus to be recalled and questioned was within the discretion of the trial court. No abuse of discretion occurred thereby.

A remark was made by this physician when he made a physical examination of defendant's body to ascertain whether there was any evidence of mistreatment or abuse of defendant, while being interrogated by the state police. This remark likened the appearance of defendant's privates to those of a bull. Defendant's counsel condemn, but do not contradict, such comment. We deem it far less offensive, vulgar and inexcusable than defendant's characterization of his victim's alleged amativeness where in but two words, too foul for permanent record, he charged her in effect with causing his passion to manifest its dominance and then resisting his efforts to gratify it. This comparison of unseemly expressions, one by the doctor and the

other by the defendant, is made only to show that defendant could not have been offended or humiliated by the doctor's terse though indelicate description.

■ The fifth assignment of error is based upon the action of the trial court in receiving said exhibit 13 in evidence.

The defendant in his confession stated that when he had finished having intercourse with Miss Hildebrand, he had wiped himself off on her pants. Exhibit No. 13 was stained with semen. That exhibit was found near the place where defendant stated in his confession that he tore them from deceased and when found, exhibit No. 13 was in close proximity to State's Exhibit No. 14, which was identified as belonging to Miss Hildebrand. No error was committed by receiving State Exhibit No. 13 in evidence.

Assignments of error numbers seven to eleven, inclusive are based upon the failure of the trial court to give defendant's requested instruction number one which was to the effect that the jury should return a verdict of not guilty; to the modification of defendant's requested instruction number two by deleting the requirement that in order that defendant's confession could be deemed to be voluntary, it must have been spontaneous; the failure of the court to give defendant's requested instruction five; the deletion by the court of the requirement that corroboration must extend to each and all of the essential elements of the crime charged; and the failure of the court to give defendant's requested instruction number eight.

In support of assignments seven to eleven, defendant relies upon the same authorities as those offered in support of the assignment No. 6, which was based upon the action of the trial court in admitting de-

fendant's confession in evidence. These authorities are as follows: Amendments VI and XIV of the Constitution of the United States; section 26-937, Vol. 3, O. C. L. A., (1940); *McNabb v. United States,* 318 U. S. 332, 63 S. Ct. 608, 87 L. Ed. 819; 20 Am. Jur. (Evidence) Sections 479, 480, 482, 483, 487, 496, 498, 499, 500, 501, 503, 514, 515 and 522.

Section 26-937, Vol. 3, O. C. L. A., is merely a declaration to the effect that a confession of a defendant cannot be given in evidence against him when made under the influence of fear produced by threats and that in order to warrant conviction there must be some other proof than the confession that the crime has been committed.

*McNabb v. United States,* 318 U. S. 332, 87 L. Ed. 819, 63 Sup. Ct. 608, being a case of federal cognizance and not being based upon constitutional grounds, is not necessarily binding upon state courts. The record in that case discloses that the defendants were arrested at their home. Theretofore they had not been arrested. When arrested they were not in custody under sentence as was the defendant in the case at bar when he was interrogated by the officers. These considerations result in the conclusion that the doctrine of the McNabb case is not controlling in the case at bar.

The above cited sections of 20 American Jurisprudence upon the subject of Evidence are statements of the principles of law bearing upon the admissibility *vel non* of confessions. A review of these principles would unduly extend this opinion and serve no useful purpose. Each of the sections so cited by defendant has been reread and considered.

■ As to the refusal by the trial court to give defendant's request number one, and the deletion by the

trial court of parts of defendant's requests numbered two and four, the action of the trial court is supported by the doctrine of *State v. Howard,* 102 Or. 431, 203 P. 311.

█ The modification of defendant's requested instruction number five was not prejudicial to defendant. It merely avoided unnecessary reference in detail by the court to the circumstances attending defendant's confession. Those details were fully presented in the evidence.

█ Defendant's requested instruction number eight could be construed as restricting the cautionary instruction concerning declarations against interest to those cases only where the declarant had a weak intellect. The instructions given by the trial court on that phase of the case were not so restricted.

With a grave realization of the result, our duty requires us to affirm the judgment of the circuit court; and it is so ordered.