## 30548. COLEMAN v. THE STATE.

JORDAN, Justice.

Defendant Wayne Carl Coleman was indicted on September 4, 1973, by the grand jury of Seminole County and charged with six counts of murder occurring on May 14, 1973, as follows: (1) Ned Alday, (2) Jerry Nelson Alday, (3) Jimmy Cecil Alday, (4) Mary Campbell Alday, (5) Aubrey Alday, and (6) Chester Addis Alday. On January 18, 1974, after finding the defendant guilty on all six counts of murder and after finding statutory aggravating circumstances as to each, the jury fixed the punishment at death by electrocution on each count. The case is here on appeal and for mandatory review of the death sentences. The record was filed in this court on October 15, 1975. After extensions of time granted to the defendant and the state for filing briefs, the case was argued in January, 1976.

The state presented evidence from which the jury was authorized to find the following facts: On the afternoon of May 14, 1973, defendant and three others, Billy Isaacs, Carl Isaacs, and George Dungee, drove to the residence of Jerry Alday located in Seminole County near the City of Donalsonville. The residence, a mobile home, was unoccupied at that moment. The defendant and one of his companions entered the mobile home for the purpose of burglary. Shortly thereafter two members of the Alday family, Jerry and his father, Ned Alday, arrived in a jeep, were escorted at gunpoint into the trailer, and were shot to death at close range with handguns. Ned Alday was shot seven times in the head by the defendant. Jerry Alday was shot four times in the head.

Shortly thereafter a tractor driven by Jerry's brother, Jimmy Alday, arrived at the trailer. After being forced to empty his pockets, he was placed on the living

room sofa and killed with a handgun fired at close range.

While one of the four was moving the tractor out of the driveway, Jerry's wife, Mary, arrived at her home by car. She was forced into the kitchen, where her purse was emptied. It contained her car keys and a dollar bill. Two other members of the Alday family, Aubrey and Chester, Jerry's uncle and brother, arrived in a pickup truck. Mary was forced into the bathroom while Aubrey and Chester were taken at gunpoint into the bedrooms and shot in a manner similar to the first two victims. The defendant killed Chester Alday with a single shot in the head.

Mary Alday was then raped by two or more of the men, including defendant Coleman. She was then taken, bound and blindfolded, in her car about six miles to a wooded area where she was raped by two of the men, was beaten when she refused to commit oral sodomy, and her breasts mutilated. She was then killed with two shots. Her watch was then removed from her nude body.

The defendant and his companions left the car they had arrived in, and fled in the Alday car, taking with them weapons and money found in the trailer and money found on the victims. The defendant and his companions abandoned the Alday car in Alabama, took possession of another auto, and continued their flight to West Virginia where they were arrested a few days after May 14th.

In his confession, the defendant admitted killing all six of the victims himself but according to the testimony of sixteen-year-old Billy Isaacs who testified for the state, defendant Coleman shot the two victims specified above. The evidence is uncontradicted, however, that each of the six victims was killed by a member of the group.

Defendant Coleman's fingerprints were identified as being on a beer can found in the kitchen of the Alday trailer, and on the car found in the vicinity of Mary Alday's body. Billy Isaacs' fingerprints were found on that same auto as well as on a camera in the Alday home and on the Alday auto found in Alabama. Fingerprints of Carl Isaacs and George Dungee were also found.

At the time of the arrests in West Virginia three handguns were found. Ballistics tests showed that these three weapons caused the deaths of the victims. One of the persons arrested had in his possession a watch identified

as belonging to Mary Alday. The defendant rested without presenting any evidence.

The jury found the defendant guilty of six counts of murder and imposed the death sentence as to each of them. On appeal, defendant enumerates two errors, the overruling of his motion for change of venue and the upholding by the trial court of the constitutionality of the death penalty. In addition, we are required by law to make an independent review of the death sentences. Code § 27-2537 (c).

The crimes described were committed on May 14, 1973. Defendant was arrested on May 18, was indicted on September 4, and his four-day trial commenced on January 14, 1974. Motion for change of venue based upon prejudicial pre-trial publicity and juror partiality was filed on September 20, 1973, was heard on September 27 and was thereafter overruled on October 9. The motion was renewed and amended immediately prior to trial. The amendment added as grounds for change of venue that two other defendants had been convicted and sentenced to death for these same crimes, and that these convictions and sentences were widely publicized and well known in the community and would cause defendant's jury to render guilty verdicts and death sentences. After voir dire and jury selection, the court overruled the motion as amended.

1. The threshhold question in this appeal is whether the trial court erred in overruling the defendant's motion for change of venue based upon prejudicial pre-trial publicity affecting the partiality of the jurors.

The motion was supported by the introduction into evidence of 14 issues of the local newspaper, 38 clippings from the Albany Herald, 24 issues of the Dothan Eagle, and 3 magazine articles. These items cover new stories during the period from discovery of the crimes on May 15, 1973, through the pre-trial hearing on the motion for change of venue. The record contains no news clippings during the three and one-half months immediately preceding the appellant's trial.

Code Ann. § 27-1201 provides for a change of venue in any criminal case where (1) an impartial jury cannot be obtained or (2) if there is a probability or danger of

violence. We are concerned in this appeal with only the question of whether an impartial jury was selected because the record demands a finding that there was no indication of mob violence in Seminole County; that there had been no outbursts or disorder during the preliminary stages of the proceeding or at the actual trial, and absolutely no evidence that the appellant's safety had been threatened in any manner. As is our duty we must then look to the voir dire record of examination of prospective jurors in an effort to determine whether or not an impartial jury could have been and was obtained for the trial of this appellant in Seminole County.

In considering this question this court fully recognizes the well established principle that a trial before a fair and impartial jury is a basic requirement of due process. We also recognize the right of the news media to report the factual happenings surrounding a crime and to report accurately a trial based thereon. To restrict the right of the press in this regard would be inconsistent with the First Amendment and with the right of the public to a free flow of information. This right of the media, however, must not be allowed to interfere with the judicial calm which must surround a trial free from emotionalism and sensationalism. The courts have attempted to balance these equities. It was stated in United States v. McNally, 485 F2d 398, 403 (8th Cir., 1973), "Just because, however, there has been widespread or even adverse publicity is not in itself grounds to grant a change of venue. As stated in Irvin v. Dowd, 366 U. S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed. 2d 751 (1961), an important case draws public attention through 'swift, widespread and diverse means of communication' and hardly any prospective juror 'will not have formed some impression or opinion as to the merits of the case.' The proper test is whether the prospective juror 'can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' Irvin v. Dowd, supra, at 723."

With these principles in mind let us now turn to an examination of the voir dire record in this case.

The record before us shows the very extensive (490 typewritten pages) voir dire questioning of the prospective and selected jurors. The record shows that the

prospective and selected jurors were questioned for approximately five to twenty minutes each by the state's counsel and counsel for the accused. The record establishes beyond doubt that the jurors selected stated that nothing they had seen, heard, or read had caused them to form an opinion for or against the appellant and that they had no fixed opinion as to the appellant's guilt or innocence. The range of the questions included whether or not the juror understood that the appellant was presumed innocent until proven guilty beyond a reasonable doubt; whether the juror understood at the moment of questioning that the appellant was presumed innocent; that the juror understood that the burden was on the state to prove guilt of the defendant beyond a reasonable doubt; that each juror's mind was perfectly impartial between the state and the accused; and that the verdict rendered by them would be determined by the evidence presented on the trial. All the selected jurors responded appropriately to these questions and in a manner satisfactory to counsel for the appellant. We note here that counsel for the appellant did not exhaust all of his peremptory challenges prior to the selection of the jury.

In addition to the answers to these general questions, the selected jurors testified on voir dire examination as follows:

Juror No. 1 - That he knew the victims only when he saw them; that he did not attend the funeral; that he knew that two of the other defendants had been tried and convicted; that he had read a lot about the cases in the newspapers and had seen and heard about the homicides on television, but that these things did not make him think the defendant was probably guilty;

Juror No. 2 - That he had worked with two of the victims but had never visited in their home, nor had they visited him in his home; that he did not attend the funeral; and that while he knew of the other trials and had read newspaper articles and had heard about the crimes on television and radio that these reports had not swayed him one way or the other;

Juror No. 3 - That he did not know any of the victims; did not attend the funeral; and although he had read and heard about the case on television and radio and that the

publicity indicated that the defendant was guilty, he felt that he could be an impartial juror;

Juror No. 4 - That he lived 5 or 6 miles from the scene of the crime and was acquainted with the victims but did not attend the funeral; that he had read and heard the news accounts of the crime and knew that two other cases had been tried with verdicts of guilty;

Juror No. 5 - That he did not know the victims and did not attend the funeral; that while he had read news reports and knew about the trial he was not swayed by them.

Juror No. 6 - That he had met one of the victims five or six years before the incident because of an insurance claim but did not attend the funeral; that he had read and heard news of the homicides and of the trials;

Juror No. 7 - That he was acquainted with all the victims except Mary Alday; that he lived some 8 miles from them; that he did attend the funeral; that what he had read and heard would not incline his mind towards defendant's guilt;

Juror No. 8 - That she was acquainted with all the victims except Mary Alday but did not know them well enough to visit in their home or to have them visit in hers; that she did not attend the funeral; that she had read newspapers and knew the outcome of the other trials;

Juror No. 9 - That she did not know the victims; that she did not attend the funeral; and that she knew the outcome of the other trials;

Juror No. 10 - That she knew some of the victims by sight only; that she did not attend the funeral; that she had read newspapers and magazine articles about the matter but felt that she could be impartial;

Juror No. 11 - That she did not know the victims; that she had read about the cases and prior convictions but felt that she could be impartial;

Juror No. 12 - That he did not personally know the victims; had read news reports of the homicides and knew that there were two prior convictions; and that he had not discussed the case.

The record in this case shows that 106 prospective jurors were examined and that twenty of these were excused initially for personal reasons (children, health,

hearing, etc.), leaving eighty-six prospective jurors. Of these nine were stricken for normal cause (seven for relationship to the victims or the prosecutors and two for unalterable opposition to the death penalty), leaving seventy-seven prospective jurors who were examined as to having formed or expressed an opinion and other matters. Thirty-eight of these were stricken on the defendant's motion for having fixed opinions as to the guilt of the accused. As noted before the defendant used only nineteen of his twenty peremptory strikes in the selection of the jurors and the state eight of its ten.

In the light of this record we now turn to the Georgia and federal cases on this subject. The law in Georgia is well established, and a myriad of cases so hold, that a motion for a change of venue addresses itself to the sound discretion of the trial judge, and that discretion will not be disturbed on appeal unless it can be shown that there was an abuse of this discretion. *Jarrell v. State,* 234 Ga. 410 (216 SE2d 258) (1975); and *Allen v. State,* 235 Ga. 709, 712 (221 SE2d 405) (1975).

This principle is echoed by the federal cases and was reiterated by the Supreme Court of the United States in the recent case of Ristaino v. Ross, — U. S. — (96 SC 1017, 47 LE2d 258), where it was said "Voir dire 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.' (citing cases). This is so because the 'determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge.' Rideau v. Louisiana, 373 U. S. 723, 733 (1963)."

Viewing this voir dire record as set forth above we cannot conclude that the trial court abused its discretion in overruling the motion for change of venue. During the voir dire examination there was no showing that the jurors summoned to try the appellant's case had formed such a fixed opinion as to either the guilt or the innocence of the appellant based on news media accounts of the homicides. We find in this case no evidence of the "total inundation of the judicial process by the media" as found by the United States Supreme Court in cases such as Estes v. Texas, 381 U. S. 532 (95 SC 1628, 14 LE2d 543) (1965) and Sheppard v. Maxwell, 384 U. S. 333 (86 SC 1507, 16

LE2d 600) (1966), nor is there any evidence in this record of trial jurors with pre-conceived opinions of the guilt of the accused as was found in Irvin v. Dowd, infra.

A recent Georgia case involving an accused who had kidnapped and buried alive his victim resulted in tremendous unfavorable media publicity concerning the crime and the accused. In reviewing appellant's new trial contention based on such publicity in that case this court stated as follows: "The test as to whether unfavorable newspaper publicity had so prejudiced a case against one accused of a crime that a fair trial cannot be had is whether the jurors summoned to try the case have formed fixed opinions as to the guilt or innocence of the accused from reading such unfavorable newspaper publicity. . . The transcript of the voir dire examination of the prospective jurors . . . shows without dispute that the jurors who were selected to try the accused had formed no fixed opinion as to his guilt or innocence and were perfectly impartial between him and the State, notwithstanding the wide newspaper publicity which was given to the case before the trial." *Krist v. Caldwell,* 230 Ga. 536 (198 SE2d 161) (1973). See also *Dutton v. State,* 228 Ga. 850, 852 (188 SE2d 794) (1972); and *Allen v. State,* supra.

The two federal decisions which give an in depth look at the question of change of venue based upon juror partiality due to pre-trial publicity are Irvin v. Dowd, 366 U. S. 717 (81 SC 1639, 6 LE2d 751) (1961) and Murphy v. Florida, — U. S. — (95 SC 2031, 44 LE2d 589) (1975). In Irvin, the accused was convicted of one murder whereas the pre-trial publicity related to six murders committed in the vicinity of Evansville, Indiana in 1954 and 1955. The events connected with these murders were extensively covered by the news media. Voir dire examination of the prospective jurors showed that from the panel of 430 prospective jurors, 268 were stricken for cause for having fixed opinions as to the accused's guilt. In all, 370 of the prospective jurors, approximately 90% of those examined, entertained some opinion as to guilt, ranging from mere suspicion to absolute certainty. The record further showed that eight of the jurors empaneled to try the case thought the accused was guilty. On the basis of this record the Supreme Court reversed Irvin's conviction and death

sentence.

In Murphy v. Florida, supra, the accused was convicted in Dade County, Florida of breaking and entering, while armed, with intent to commit theft, and assault with intent to commit robbery. He was notorious for his part in an earlier New York museum jewel theft, and his flamboyant life style caused him to be known in the press as "Murph the Surf." He had been convicted of murder and pled guilty to a federal indictment involving stolen securities. Each new case was well publicized. Upon the trial of his case in Dade County, Florida, seventy-eight prospective jurors were questioned, thirty being excused for personal reasons, twenty being stricken peremptorily by the defense and prosecutor with the remaining eight serving as a jury of six with two alternates. On the basis of this record the Supreme Court affirmed Murphy's conviction, distinguishing Irvin v. Dowd, supra, as follows: "In Irvin v. Dowd, for example, the court noted that 90% of those examined on the point were inclined to belief in the accused's guilt, and the court had excused for this cause 268 of the 430 veniremen. In the present case, by contrast, 20 of the 78 persons questioned were excused because they indicated an opinion as to petitioner's guilt." The court went on to say, "In sum, we are unable to conclude, in the circumstances presented in this case, that petitioner did not receive a fair trial. Petitioner had failed to show that the setting of the trial was inherently prejudicial or that the jury selection process of which he complains permits an inference of actual prejudice." 44 LE2d 596.

In our opinion the record in this case more nearly parallels the factual situation in the Murphy case, supra, and is distinguishable from the Irvin v. Dowd case.

Another reason for our conclusion that the trial court did not abuse its discretion in overruling the motion for change of venue is the fact that the appellant failed to exhaust all of his peremptory challenges. The general rule is that appellate courts will not reverse the trial court's overruling of a motion for change of venue where the appellant has not exhausted his peremptory challenges. United States v. Moran, 236 F2d 361, (2d Cir.) (1956) (Cert. den., 352 U. S. 909); Haddock v. State, 192 S.

802 (Fla.) (1939); State v. Pearson, 224 La. 393 (69 S2d 512) (1953); State v. Layton, 174 Ore. 217 (148 P2d 522) (1944) (Cert. den., 347 U. S. 924); Meador v. United States, 341 F2d 381 (9th Cir.) (1965); and Bradley v. State, 245 Ind. 324 (198 NE2d 762) (1964). For instance, in this case if the defendant had thought that the one juror who attended the funeral to be impartial for this reason, he could have made use of his unused peremptory strike.

2. Another reason for concluding that the trial judge did not abuse his discretion in this case is that during the trial the state presented an overpowering and overwhelming mass of evidence on the question of the appellant's guilt. The appellant made no effort to refute this mass of evidence in any manner whatsoever. In addition, the state introduced a confession of the appellant in which he freely and voluntarily admitted his active participation as a trigger man in this horrible crime, including the execution style killing of the five male victims and the murder and rape of the female victim. Under this evidence no other verdict could have reasonably been returned by a jury regardless of the locale of the trial.

This court in *Hussey v. State,* 69 Ga. 54, 57 (1882) in denying a new trial based on admitted error, said, "There is no room, at all, for doubt as to his guilt. It is the strongest case, of the sort, ever brought to this court within our knowledge and recollection, and no matter how many trials he might have, the facts and law absolutely demand the verdict of guilty, and such it would be unless both facts and law were outraged by the jury and their oaths violated." This case was cited in *Poole v. State,* 100 Ga. App. 380, 384 (111 SE2d 265) (1959), where it was said, "However, error, to be reversible, must be harmful. In the present case the only evidence in the record is that of the State's witnesses. The defendant offered no evidence and made no statement, and the evidence of the State demands a verdict of guilty. Accordingly, the error of the trial court in failing to exclude the jury is not such as will bring about a reversal in this case. See *Hussey v. State,* 69 Ga. 54; *Slappey v. State,* 6 Ga. App. 526 (65 SE 254); *Bienert v. State,* 85 Ga. App. 451 (69 SE2d 300). This would not be the case had the jury been authorized to

render a verdict for the defendant. Of course, a verdict is never demanded in a criminal case in the sense that the court may direct a guilty verdict. However, where, as here, the defendant makes no statement denying his guilt, and the evidence authorizes only a guilty verdict, such verdict is demanded in the sense that errors occurring on the trial may be harmless." See People v. Westrup, 372 Ill. 517 (25 NE2d 16) (1939), and 24A CJS 927, Criminal Law, § 1894.

After a thorough consideration of this record and in view of the authorities cited above, we firmly conclude that the trial court did not abuse its discretion in overruling the appellant's motion for change of venue.

3. There is no merit in the appellant's attack on the constitutionality of Georgia's Death Penalty Statute (Ga. L. 1973, pp. 159-172; Code Ann. § 27-2534.1). *Coley v. State,* 231 Ga. 829 (204 SE2d 612) (1974) and subsequent decisions of this court.

4. We are required by Ga. L. 1973, p. 159 et seq (Code Ann. § 27-2537 (c) (1-3)) to review all sentences of death as to three criteria.

As to the first, we conclude that the sentences of death imposed in this case were not imposed under the influence of passion, prejudice, or any other arbitrary factor (See Division 1 of the opinion).

Secondly, we conclude that the statutory aggravating circumstances found by the jury (murder while in the commission of burglary and kidnapping as to 5 counts and murder while in the commission of armed robbery, burglary and kidnapping as to 1 count) was supported by overwhelming evidence as to each count.

Thirdly, we have compared the evidence and sentences in this case with similar cases contained in the appendix attached to this opinion. This case involves multiple execution type murders while in the commission of other capital felonies. Wayne Coleman's sentences to death are not excessive or disproportionate to the penalty imposed in similar cases considering the crimes and the defendant.

*Judgment affirmed. All the Justices concur, except Ingram, J., who concurs in the judgment only, Hall, J., who concurs in Divisions 3 and 4 and the judgment, and*

*Gunter and Hill, JJ., who dissent.*

ARGUED JANUARY 12, 1976 — DECIDED JUNE 22, 1976.

*Tracy Moulton, Jr., Harold Lambert,* for appellant.
*J. Frank Myers, District Attorney pro tem, Peter Zack Geer, Arthur K. Bolton, Attorney General, Kirby G. Atkinson, Staff Assistant Attorney General,* for appellee.

APPENDIX.

Similar cases considered by the court: *Henderson v. State,* 227 Ga. 68 (179 SE2d 76) (1970); *Pass v. State,* 27 Ga. 730 (182 SE2d 779) (1971); *Watson v. State,* 229 Ga. 787 (194 SE2d 407) (1972); *Callahan v. State,* 229 Ga. 737 (194 SE2d 431) (1972); *Sirmans v. State,* 229 Ga. 743 (194 SE2d 476) (1972); *Scott v. State,* 230 Ga. 413 (197 SE2d 338) (1973); *Whitlock v. State,* 230 Ga. 700 (198 SE2d 865) (1973); *Kramer v. State,* 230 Ga. 855 (199 SE2d 805) (1973); *Bennett v. State,* 231 Ga. 458 (202 SE2d 99) (1973); *Howard v. State,* 231 Ga. 186 (200 SE2d 755) (1973); *Hunter v. State,* 231 Ga. 494 (202 SE2d 441) (1973); *Morgan v. State,* 231 Ga. 280 (201 SE2d 468) (1973); *House v. State,* 232 Ga. 140 (205 SE2d 217) (1974); *Gregg v. State,* 233 Ga. 117 (210 SE2d 659) (1974); *Floyd v. State,* 233 Ga. 280 (210 SE2d 810) (1974); *Chenault v. State,* 234 Ga. 216 (215 SE2d 223) (1975); *Smith v. State,* 236 Ga. 12 (222 SE2d 308) (1976); *Mason v. State,* 236 Ga. 46 (222 SE2d 339) (1976).

HILL, Justice, dissenting.

In reviewing death sentences, this court is required by law (Ga. L. 1973, pp. 159, 165; Code Ann. § 27-2537 (c) (1)) to make three determinations, one of which is to determine whether the sentence of death "was imposed under the influence of passion, prejudice, or any other arbitrary factor." In this review, this court must make its own determination.

Although I can unhesitatingly say that the statutory aggravating circumstances found by the jury are amply supported by the evidence and that, considering the crime and the defendant, the death sentences imposed in this case are not excessive or disproportionate to the penalty

imposed in similar cases (Code Ann. § 27-2537 (c) (2) (3)), I am unable to declare that the sentences were not imposed under the influence of passion, prejudice or other arbitrary factor. I do not say that they were, but I cannot, as the law requires, say that they were not.

The approval by this court of the sentence of death is the most awesome of our responsibilities. When the time for execution of the sentence arrives, the matter will be beyond our control and I want no second thoughts or reservations. I therefore must respectfully dissent for the reasons which follow.

The majority of this court treat change of venue and the approval of the sentence of death as two separate issues. Because of the necessity that I determine whether the death sentence was imposed under the influence of passion, prejudice or any other arbitrary factor, I am unable to separate these two issues.

Seminole County has a population of seven thousand according to the 1970 census (four thousand 21 or over) and is located in the southwest corner of Georgia. In addition to the transmission of the news by oral communication, the county residents read the Donalsonville News, published weekly with circulation of 1800 copies in Seminole County. They also read the Albany Herald, published daily with circulation of 518 copies in Seminole County, and the Dothan Eagle. Television stations in Albany, Dothan and Tallahassee are seen in the county. Although the record contains no television tapes or radio scripts, prospective jurors testifying on voir dire recalled having seen or heard news of the Alday murders on TV and radio.

The record contains 14 issues of the weekly Donalsonville News, 38 clippings from the daily Albany Herald, 24 issues of the daily Dothan Eagle, and three magazine articles, all introduced in connection with the September 27 hearing and dated during the period May 15 to September 28, covering the period from discovery of the crimes through the pre-trial hearing on the motion for change of venue. The articles of record report that three of the four men had escaped from a Maryland prison facility where this defendant was serving 10 years for robbery, that a truck had been stolen during the escape, that the

car found near Mary Alday's body belonged to a Richard Wayne Miller, that Mr. Miller was missing, that this defendant had confessed to having killed Miller because Miller witnessed the theft of the truck used in the escape, and that this defendant was taken to Maryland to help locate Miller's body.

The news articles reported that 2,500 people attended the mass Alday funeral where one of the preachers performing the service was reported to have asked the weeping crowd to pray for those responsible for this awful destruction, saying: "I hope and pray that before they close their eyes in death they will come to see what they are."

The Sheriff of Seminole County is reported by the press to have said: "If I had my way about it, I'd have me a large oven and I'd precook them for several days, just keep them alive and let them punish . . . And I don't think that would satisfy me. . . Whenever I'm protecting them, I'm going to do my job and bring them to court, and I hope they'll get justice . . . I don't see where they could put up any plea for mercy. . . The acts of these men are lower than animals . . . If a citizen gets out of hand and starts shooting people up, there's only one way to arrest and that's with a shotgun . . . Any man that believes in God believes in capital punishment . . . I could throw the switch to the electric chair and never lose a minute's sleep."

The voir dire examination shows that of the 77 prospective jurors who were examined as to having formed or expressed an opinion, 38 were stricken on defendant's motion for having fixed opinions as to the guilt of the accused, leaving 39 jurors. The defendant used 19 of his 20 peremptory strikes and the state used 8 of its 10, leaving only 12.

Examination of the voir dire of those prospective jurors stricken peremptorily by the defendant shows that 10 stated that they had formed no opinion as to the guilt of the accused. One such stricken juror expressed the belief that the two men convicted earlier were guilty, conceded that the news articles she read in the Donalsonville paper all referred to all four defendants, acknowledged that she believes what she reads, but felt she could be impartial.

Another such juror expressed the belief that the newspapers "just told what happened." One stated that although he had discussed the two defendants already found guilty, he had not discussed this defendant. Two were related to witnesses and would believe their testimony.

One prospective juror stricken peremptorily by the defendant testified on voir dire that she had known the victims for 8 or 9 years, except that she had known Mary Alday only a little over 2 years, that she had attended the funeral and had read the newspapers and heard the news, that she had testified as a witness for the state in the two prior trials, that she was named to be a witness in this case, and that she had not been influenced by what she had heard and could give the defendant a fair trial. (When called as a witness in this case, she testified that she worked with Mary Alday and that she last saw her at 5 p.m. on May 14. The witness identified the clothing Mrs. Alday had been wearing and identified Mrs. Alday's watch.) Defendant's challenge for cause to this juror was overruled and she was stricken peremptorily.

On voir dire, the twelve jurors who served testified as follows:

Juror No. 1 testified that he knew the victims when he saw them. Although he did not go to the funeral, two days after their deaths he went by the trailer to pay his respects. He knew the two other cases were tried and their outcome and had discussed those trials. He had read a lot about the cases in the newspapers and had seen and heard about the homicides on television and radio. The things he had heard did not make him think the defendant was probably guilty.

Juror No. 2 (later selected as foreman) testified that he had known the victims for eight years and had worked with two of them. They had never visited in his home nor he in theirs and he did not attend the funeral. He knew that two other defendants had been tried and both were found guilty but he had not discussed it with anyone. He had read newspaper articles and heard on television and radio about the crimes. Although the news he had read and heard pointed to defendant's guilt, the reports did not sway him one way or the other.

Juror No. 3 did not know the Aldays. He did know of the prior trials and convictions and he knew that this defendant was the fourth man. Although he had read about the case in the newspaper, he had seen it on television only once or twice. Although the publicity indicated that the defendant was guilty, he felt he could be impartial.

Juror No. 4 lived five or six miles from the trailer and knew all the Aldays but did not attend the funeral. He had read and heard some news accounts and knew that two other cases had been tried and verdicts of guilty returned.

Juror No. 5 did not know the victims. He had read news reports and knew about the trials but was not swayed by them.

Juror No. 6 had met one of the victims five or six years earlier in connection with an insurance claim. He had read and heard news of the homicides and of the trials.

Juror No. 7 knew all of the Aldays except Mary and went to the funeral. He had seen newspaper and television accounts of the crimes and trials.

Juror No. 8 knew all of the Aldays that were killed except Mary but did not know them well enough to visit them and did not attend their funeral. She had read newspapers and knew the outcomes of the other trials.

Juror No. 9 did not know the Aldays. She kept up with the cases on television and by newspaper and had discussed the matter with a friend. She knew the outcome of the earlier trials.

Juror No. 10 knew the victims by sight and had seen newspaper and television accounts of the other trials. She also had read a magazine article about the matter. The information she had read was unfavorable to the defendant but she felt she could be impartial.

Juror No. 11 did not know the victims personally. She had read in the paper about the cases and prior convictions. The information she had read was unfavorable to the defendant and she believed to some extent the things she had read but felt she could be impartial.

Juror No. 12 knew the victims when he saw them but did not know them personally. He had read news reports of the homicides and knew there were two prior

convictions. He had not discussed the case.

In summary, four of the impaneled jurors thought that the publicity indicated that the defendant was guilty but felt that they could be impartial. Another juror attended the Alday funeral and another went to the Alday trailer to pay his respects. A majority of the jurors knew one or more of the victims. All twelve were aware of the outcome of the two earlier trials of co-defendants.

In summary, I personally cannot make the necessary determination that the jury which imposed these sentences of death acted dispassionately. I would reverse and grant the defendant a change of venue. Although another jury from a different venue would be authorized under the law to reach the same verdict, at least I could then declare that I found that its decision as to sentence was not imposed under the influence of passion, prejudice or other arbitrary factor.

I must therefore respectfully dissent.