## 34225. MOONEY v. THE STATE.

HALL, Justice.

Appellant John Henry Mooney was indicted with Elmo Florence for the murder of T. K. Harty. He was tried separately, and was convicted by a jury and sentenced to life imprisonment on May 2, 1978. He brings this appeal.

The trial evidence showed that on August 30, 1977, the body of Harty, the owner of a saloon in Athens, Georgia, was discovered slumped over a desk in his home. He had been shot once in the back of the head, apparently during the preceding evening. Shortly thereafter, one Reinhold, a restaurant-bar owner in Athens, informed police that one Elmo Florence had admitted to Reinhold over drinks that he had been the "hit man" who killed Harty, and that he had been hired to do the killing by John Mooney, appellant, who operated "Somebody's Pizza." Florence had provided a wealth of detail about the killing, which tallied with the actual physical evidence of the crime. Apparently Florence was soliciting from Reinhold additional employment as a paid killer.

A warrant was issued for Mooney, and he was arrested in Atlanta, Georgia, on October 7, 1977. During a police search of his belongings at the jail, some incriminating papers and notes were found in a plastic shopping bag. The notes themselves were introduced at the subsequent trial, and they led to two witnesses, Gatch and Stephen Florence, who testified for the state.

The remaining facts will appear in the discussion of the eight alleged trial errors of which Mooney now seeks review.

### 1. The Search

Mooney first argues that the seizure of his luggage and numerous police searches of the shopping bag were done without a warrant and without his consent, and were not valid inventory searches. Therefore, he argues, they were illegal under the Georgia and United States Constitutions and further violated Code Ann. § 27-301, and the trial court erred in denying his motion to suppress all the fruits of the searches.

The evidence concerning the arrest and searches showed that Mooney was arrested by Cobb County Police

with a warrant, in a parking lot of an apartment building where he was standing with Rick Newman, a former college roommate. Mooney was in transit from Europe to his home in Athens and had arrived at Newman's apartment with his luggage. Newman testified that he had not wanted to allow Mooney to enter his apartment, so the two men had placed Mooney's luggage temporarily in Newman's Datsun in the parking lot while they went for a drink.

At the time of Mooney's arrest, the two men were 75 or 100 yards away from the Datsun. Mooney later testified at a hearing on his motion to suppress that the fate of his luggage was something that simply did not cross his mind one way or another as he was being taken away. After Mooney was gone, Lt. Moss informed Newman of the penalties for harboring and aiding a fugitive. Newman stated that he did not want to be involved. Aware that Mooney was reported by police radio to have luggage with him, Lt. Moss asked where it was, and was told it was in the Datsun. Newman opened the car door, and he and the officer removed the items. Lt. Moss told Newman that if he did not want any further involvement, police would just take Mooney's things and send them on to jail where Mooney was headed. Newman asked for and received a receipt. Mooney's articles, which we term "the luggage," consisted of a pair of boots, a black leather suitcase, and a green shopping bag. All were placed in a police vehicle.

Lt. Moss testified that he knew Mooney was charged with murder, but did not know which murder. His purpose in acquiring the luggage was merely to send it along with the prisoner. Newman testified that he did not "volunteer" to give the luggage to the officer; that Mooney had never specifically asked him to keep it; that he had not wanted to allow Mooney into his apartment and had placed the luggage in the Datsun as a temporary alternative; that he gave officers the bags "under the entire circumstances of the evening" and was not coerced by the officer's remarks about harboring a fugitive.

We must evaluate these facts in light of Mooney's claim that this was an unconsented-to, warrantless search of the car and seizure of the luggage. The state's assertion that Mooney is without standing to object to the

seizure of his personal belongings is plainly wrong. Rakas v. Illinois, —- U. S. —- (99 SC 421, 58 LE2d 387) (1978).

Initially, we note that the state does not attempt to justify this action as a search and seizure incident to arrest. Therefore, Code § 27-301, argued by Mooney, is inapposite. Similarly, the state makes no claim that Mooney consented to this taking of his personalty. Rather, the state contends that Newman voluntarily turned over the items; that he had the authority to do so; and that the later searches were properly done as an inventory procedure.

We will consider first the correctness of the officer's decision to acquire the luggage. Mooney contends that the police had no "right, duty, or obligation" to take his possessions into safekeeping and thus had no need to perform the subsequent inventory search which revealed damaging evidence. His theory is apparently that the police could merely have left the luggage in Newman's automobile. We cannot agree.

It is well established that a police seizure and inventory is not dependent for its validity upon the absolute necessity for the police to take charge of property to preserve it. They are permitted to take charge of property under broader circumstances than that. In United States v. Ducker, 491 F2d 1190 (5th Cir. 1974) an inventory search of an automobile was approved after its owner had been arrested for passing counterfeit money, although the automobile was safely parked in a parking lot. Officers chose to take it in because it was packed with items and they feared for it to be left unattended at the lot. That search was approved. In Cady v. Dombrowski, 413 U. S. 433 (1973), officers arrested an out-of-state police officer and later searched his automobile for his service revolver under the impression that he must have had one with him and that it would be unsafe for the general public to leave it lying around where it might be stolen. That search was not absolutely required, but it was upheld. Accord, United States v. Kelehar, 470 F2d 176 (5th Cir. 1972).

A case presenting similar facts to those before us was United States v. Gravitt, 484 F2d 375 (5th Cir. 1973) cert. den. 414 U. S. 1135 (1974), in which Florida police

arrested men who were traveling. The police expected within a few days to return them to Georgia for criminal proceedings. On one of the men they found, in addition to false identification, a motel key. At the motel they found the room rent had been paid for three days, and the suspects' automobile was in the motel lot. Police seized the car, searched it in performing an inventory, and discovered a small arsenal which was introduced at the suspects' subsequent trial for firearm offenses. The non-necessity for police seizure of that automobile was emphasized by appellants and was rejected by the court: "On oral argument the appellant placed much stress on the fact that the motel rent was prepaid for two days beyond the time of the seizure of the car, and that the car therefore could have remained where it was, in the motel parking lot, for two more days. The argument was that the police did not in fact have to seize the car to protect it, at least not until the time it was entitled to remain where it was had expired. We cannot accept this suggestion. For us, the crucial fact is that the officers had every reason to expect that the detention of the Gravitts would last a good deal longer than two days. Given that fact, it was reasonable for the officers to take the car whenever it was most convenient for them to do so; and presumably it was most convenient immediately following the arrest, when they were at the motel with the car keys. Indeed, the officers' immediate seizure of the car may have been warranted on grounds beyond convenience. There were some dangers involved in allowing the car to sit unattended at the motel for two days, although to be sure the motel management would not have had it towed away during that time. The car might have been stolen or damaged while standing there; or something inside it might have been taken. The officers' action in immediately taking custody of the car appears to have been the prudent thing to do." 484 F2d at 380 n. 5.

We note that there is language in both *Dunkum v. State,* 138 Ga. App. 321 (226 SE2d 133) (1976) and *State v. McCranie,* 137 Ga. App. 369 (223 SE2d 765) (1976) suggesting that perhaps seizure and inventorying of an automobile not involved in an offense against the law may be justified only where the automobile poses some threat

to the traveling public, such as impeding the roadway. But in light of our analysis above concerning the permissible scope of the police caretaking and inventorying function, any such inference from *Dunkum* and *McCranie* will be mistaken.

Mooney cites on this point *State v. Travitz*, 140 Ga. App. 351 (231 SE2d 127) (1976) and *State v. Ludvicek*, 147 Ga. App. 784 (250 SE2d 503) (1978). Those cases lend him little support, however, because in neither was the owner of the property seized arrested, and in neither was the property in danger of being left with an unwilling bailee.

The analysis above convinces us that the decision of the officer to request the luggage from Newman as a protective custody action was not improper. United States v. Gravitt, supra; Lowe v. Hopper, 400 FSupp. 970 (SD Ga. 1975). The fact that the property involved was personalty with which Mooney had been traveling in Europe further illustrates the reasonableness of the police action here. Presumably the contents would be clothes, toiletries, reading matter and the kinds of personal effects a prisoner would need.

Under the circumstances here, issues of probable cause and time to obtain a warrant do not arise.

We turn now to the question of the voluntariness of Newman's consent. Whether or not consent to search was freely given is an issue on which the state must carry the burden of proof; the trial court must make a factual determination; and the test is the "totality of the circumstances" under Schneckloth v. Bustamonte, 412 U. S. 218, 226 (1973); United States v. Scott, 578 F2d 1186, 1188-1189 (6th Cir.) cert. den. 99 SC 201 (1978). We conclude that the trial court did not err in finding Newman's consent voluntary and effective. Review of his testimony shows that he was torn between two unattractive alternatives—keeping the unwanted luggage or turning it over—and finally decided to take a receipt and get rid of it.

Mooney, in making no provision for the luggage, had in effect abandoned it in Newman's automobile with no undertaking from Newman to keep it. Newman was at best a reluctant bailee, and thus Mooney's argument that Newman had no authority to dispose of the luggage is

clearly erroneous. The third party consent cases argued by Mooney are factually inapposite.

At this point, all that has been decided is that the police lawfully acquired possession of Mooney's luggage. Their further acts of searching that luggage must be differently analyzed.

Following his arrest, Mooney was taken to the Cobb County jail to await Clarke County authorities. Deputy Cantrell testified that he heard Sgt. Apple tell Mooney "that his possessions would be coming to him." Prisoners in Mooney's circumstances could call for luggage articles and have them brought. When his possessions arrived at the jail, Deputy Cantrell handled them in the "in-take area" and "began to inventory it" for weapons and contraband, which is "a standard procedure " "to protect us from any weapon that might be in there that the people might call for." Past experience had also turned up drugs and razor blades hidden in folded paper, "so we normally unfold the paper and check to see if there's anything in it."

After checking the suitcase, the officer moved on to the plastic shopping bag, which was open at the top and had written on it "Switzerland." Inside he found and unfolded some pieces of paper and "just out of normal curiosity I began to read them, and I saw the word death on there, and I immediately called my watch commander," Ganues, who also read that part of the note concerning "death," though not the entire note.

The entire text of the heavy-inked, handwritten "death" note is as follows:

> *"Probably.*        Oven Part
>    Elmo & I seen together on Monday
>    Me giving Elmo's wife $125.00
>       the week after T. K. death.
>    Fingerprints on Balistic [sic] tests
>       tying the gun & Elmo & TK's
>       residence. *No weapon.*
> *Possible*
>    Elmo's nephew overhearing a
> conversation Between me & Elmo
> talking about shooting T. K.
>    Deny"

Around 3:00 a.m., Chief Tate Brown of the Clarke County police and GBI Agent Jerry Massey arrived to get Mooney. Cantrell told him of the note containing the word "death." Apparently Brown and Massey found the documents spread out on a counter and looked at them and repacked them. Brown returned with Mooney to Clarke County where he searched the luggage, terming the search an "inventory" for the purpose of "prevent[ing] weapons from going into the jail and any valuables; to prevent theft of valuables of the prisoners." He listed the items.

As a result of these "searches," certain of the notes were introduced into evidence by the state at Mooney's trial, and leads were obtained to two state witnesses.

As the state argues this was an inventory search, our starting point is South Dakota v. Opperman, 428 U. S. 364 (1976) where the United States Supreme Court approved as reasonable a warrantless search of an automobile impounded by police for multiple parking violations. The search was conducted without investigative motive, pursuant to a standard police inventory procedure. Though officers plainly had time to secure a warrant, none was held required.

"When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody . . .; the protection of police against claims or disputes over lost or stolen property . . .; and the protection of the police from potential danger . . ." South Dakota v. Opperman, 428 U. S. at 369.

"The decisions of this court point unmistakably to the conclusion reached by both federal and state courts that inventories pursuant to standard police procedures are reasonable." Id. at 372.

Though Opperman dealt with an automobile, one of the cases specifically approved by it was United States v. Gravitt, supra. The court quoted approvingly Gravitt's language which recognizes inventory searches of "any sort of container." Opperman, 428 U. S. at 371. The Fifth Circuit had this to say in Gravitt: "This Court has

consistently recognized that the fourth amendment is not violated when the police take custody of the property of persons they arrest to store that property for safekeeping . . . [W]e recognized that when the police take custody of any sort of container — be it an automobile, suitcase, or any other thing in which property may be stored—it is reasonable to search the container to itemize the property to be held by the police . . . These decisions reflect, of course, the underlying principle that the fourth amendment proscribes only unreasonable searches . . . In Lipscomb we articulated the considerations underlying the view that custodial seizures and accompanying inventory searches are reasonable: 'It cannot be denied that to prevent escape, self-injury, or harm to others, the police have a legitimate interest in separating the accused from the property found in his possession. An inventory is then necessary both to preserve the property of the accused while he is in jail and to forestall the possibility that the accused may later claim that some item has not been returned to him.' 435 F2d at 800. Our view is in accord with decisions of other circuits [and with] . . . the American Law Institute's Model Code of Pre-Arraignment Procedure . . ." 484 F2d at 378-379.

An inventory is not for the exclusive protection of the owner, but also serves to protect the police, and therefore it is not necessary that police ask a prisoner whether he wants his items to be inventoried. See United States v. Edwards, 577 F2d 883 (5th Cir. 1978). However, the inventory must not be done with an investigative intent, but it should be incident to the caretaking function of the police. Opperman, supra, 428 U. S. at 374-375. It is frequently noted that the inventory rationale is one which may be abused and stretched to cover unnecessary searches; but even some suspicion that contraband will be found will not void an otherwise valid inventory search. United States v. Ducker, 491 F2d 1190 (5th Cir. 1974).

As the Fifth Circuit has recently written, "Only so long as the scope of the search is reasonable, taking into consideration the three interests to be protected by the inventory, will it be held to be a constitutionally permissible intrusion. . . The standard we advocate is necessarily flexible and is to be applied on a case by case

basis. . ." United States v. Edwards, 577 F2d 883, 893 (5th Cir. 1978).

Mooney contends that the police could have inventoried the contents of the plastic bag in question without opening it or reading its papers. This contention is not new.

In Lowe v. Hopper, 400 FSupp. 970 (SD Ga. 1975) aff'd. 520 F2d 1405 (5th Cir. 1975), a state officer at the scene of a suspected arson and murder took possession of a pouch containing Lowe's personal papers. The pouch had been pointed out to the officer by the sisters of the dead woman, as it lay in Lowe's automobile at the scene. They had refused to take responsibility for it after Lowe, the victim's husband, had been arrested.

In the course of his inventory of the pouch, the officer opened a sealed envelope and read the letter inside, discovering that it was highly incriminating murder-suicide communication written by Lowe apparently some months before. Lowe moved to suppress the letter as the fruit of an unlawful search and seizure.

In examining the inventory for possible unreasonableness in subsequent post-conviction proceedings, the district court specifically asked whether Lowe's rights were violated when the officer opened the sealed envelope and discovered the incriminating letter. The court wrote: "Counsel for Lowe suggested . . . that, in the absence of a search warrant, if the officer desired protection against any possible claim as to loss of valuables, he could have obtained same by placing his signature on the pouch (or envelope) and have the relatives do likewise. It was further suggested that someone at headquarters could have signed the envelope denoting that it was sealed. At the hearing on remand, Lieutenant Lowery admitted that a member of the family could have initialed the envelope rather than opening it and looking at the letter. He may, indeed, have handled the matter that way. But I am not aware of any constitutional requirement as to the exact way in which officers may properly protect themselves in such cases. Informality is not unconstitutionality." 400 FSupp. at 975. The court further wrote, "I am not persuaded that the Fourth Amendment means that an inventory inspection

of papers properly in police possession must be in accord with strict procedures established by police regulations as to time, place and method. If an inventory is made immediately after an officer obtains possession of effects, any subsequent claim that valuables are missing would be more difficult to show." Id. at 977. The court found the police action proper as a "nonpretextuous" inventory, and approved the use of the incriminating evidence.

In United States v. Edwards, supra, police officers, while conducting an inventory of an automobile, came across stolen welfare checks and identification cards which they read and examined. They noted that the different identification cards contained the same photograph of a black female whom they had reason to suspect, but with different names on them. The officers suspected a scheme to cash stolen checks.

It is significant that a panel decision of the Fifth Circuit, 554 F2d 1331 (1977) found the claimed inventory search to be invalid because it was too extensive. Significantly, the panel decided that the officers were not permitted to read the papers uncovered in the inventory. Id. at 1338 n. 12. On rehearing en banc, however, the panel decision was vacated, and the inventory search was approved. Significantly, in an alternative probable cause analysis, the full court wrote that the officers could have used the information read off the cards during the inventory to contribute the elements required for probable cause— plainly ruling that reading the contents of papers during an inventory is not per se improper. Accord, United States v. Grill, 484 F2d 990 (5th Cir. 1973) cert. den. 416 U. S. 989 (1974) (inventory reading of hotel receipts and an airline ticket found in suitcase, allowed).

In the instant case, the notes in issue were quite short and boldly written. An officer unfolding them could hardly fail to gain some knowledge of their contents.

The record supports the trial court's conclusion that Cantrell was not searching for evidence at the time he inventoried the bag and was not expecting to find any particular language in the notes. The discovery of incriminating evidence was completely inadvertent. As he unfolded the notes their contents were obvious, and looking at such papers is not comparable to perusing a

book or diary which might be inventoried without being read. We note additionally that the "plain view" doctrine would also seem to allow reading such items. As the court wrote in Coolidge v. New Hampshire, 403 U. S. 443, 465 (1971), "where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate." The doctrine will support a warrantless search and seizure if the agents are lawfully in position to obtain the view, the discovery is inadvertent, and the object viewed is immediately seen to be incriminating. United States v. Diaz, 577 F2d 821, 823 (2d Cir. June 27, 1978). Accord, *Redd v. State,* 240 Ga. 753, 754 (243 SE2d 16) (1978).

The cases cited by Mooney, including United States v. Chadwick, 433 U. S. 1 (1977), do not counsel a different result because they were not inventory cases.

Chadwick was perhaps a "luggage" case, involving a double locked footlocker seized by agents from the trunk of a non-moving automobile at the time of the defendants' arrests and searched one and one-half hours later at a federal building. There was neither consent nor a warrant for this search, which turned up large quantities of marijuana. It was not contended that any exigency required an immediate search. The court held that neither the automobile exception nor the search-incident-to-arrest exception to the warrant requirement could justify this search. The defendants' reasonable expectation of privacy in the locker was a key consideration.

We acknowledge that, under Chadwick, where the luggage of a person arrested is seized, as the dissenting opinion in Chadwick points out, it is not always easy to tell whether a subsequent search is a true, nonpretextual inventory, or whether it is a search for which probable cause and other elements must be present. Reasonable *"noncriminal* inventory searches" are valid under Opperman as the Court in Chadwick acknowledged. Chadwick, 433 U. S. at 10, n. 5. (Emphasis supplied.)

It is undeniable that Chadwick narrowed the right of officers to search incident to arrest, and for that reason various federal circuit courts have refused to apply it

retroactively to searches occurring prior to its decision date. E.g., United States v. Diaz, 577 F2d 821, 824 (2d Cir. 1978); United States v. Berry, 571 F2d 2 (7th Cir.) cert. den. 99 SC 129 (1978); United States v. Montgomery, 558 F2d 311 (5th Cir. 1977). The search here was post-Chadwick.

As a search-of-luggage-in-custody case, Chadwick necessarily impinges on an inventory search of luggage to some extent, and therefore on Mooney's case, though what was involved in Mooney's case was a shopping bag, open at the top. Study of the decisions of the United States Circuit Courts of Appeal on this point, decided after Chadwick, indicates that perhaps Chadwick is best understood as a case in which the Court was urged to extend the "automobile exception" automatically to luggage found within an automobile, and declined to do so. See United States v. Finnegan, 568 F2d 637, 641 (9th Cir. 1977). After Chadwick, the question is whether officers were truly pursuing an investigatory or an inventory search. United States v. Diggs, 569 F2d 1264 (3d Cir. 1977).

We decide that this search was reasonable under all the circumstances (Chadwick, 433 U. S. at 7) because officers were in good faith carrying out an inventory procedure without investigative intent. Therefore, the search was not violative of Mooney's Fourth Amendment rights. See United States v. Edwards, 415 U. S. 800, 804, n. 6 (1974); United States v. Robinson, 414 U. S. 218 (1973).

It follows that Officer Cantrell's conduct in reading and calling attention to the "death note" was not improper. Indeed, it was appropriate police action. Therefore, the subsequent acts of officers in Cobb and Clarke Counties, in re-reading and perusing the documents in question were plainly justified under the "second glance doctrine." "The underpinning of these cases is that the items in question have been exposed to police view under unobjectionable circumstances, so that no reasonable expectation of privacy is breached by an officer's taking a second look at matter with respect to which expectation of privacy already has been at least partially dissipated." United States v. Grill, 484 F2d 990, 991 (5th Cir. 1973). Cf. United States v. Edwards, 415

U. S. 800, 802 (1974) (search once justified may be made later); Cady v. Dombrowski, 413 U. S. 433 (1973) (two searches).

Finally, contrary to Mooney's assertion, there is nothing inherent in "papers" which immunizes them from searches otherwise proper under the Fourth Amendment. Andresen v. Maryland, 427 U. S. 463 (1976).

Accordingly, the trial court did not err in allowing the fruits of these searches to be introduced at Mooney's trial.

### 2. Change of Venue — Pretrial Publicity

Mooney next argues that the trial court erred in denying his pretrial motions for a change of venue. He introduced in support of his motion some 30 articles from local newspapers, which were published from the time of discovery of the victim's body on August 30, 1977, to November 11, 1977. The trial was begun April 24, 1978, some five months after the last of these articles.

The articles appeared prominently in the Athens Banner Herald, The Daily News, The Athens Observer, and the Red and Black. These papers apparently reach over 50 percent of the households in Clarke County. Several articles involved front page headlines. The content of the articles included the arrest of Florence; his statement to Reinhold implicating Mooney as the one who paid him to do the killing; speculation that Mooney had been seen buying an unregistered gun prior to the killing; the inception of a nation-wide alert for Mooney; speculation that Mooney had been expecting to be evicted by Harty from one of his restaurant locations; his subsequent arrest; the contents of the notes found in Mooney's luggage including an apparent plan for Florence to "take the rap" in return for Mooney's providing for Florence's family.

Mooney also introduced scripts of radio news spots during September and October concerning the Harty murder, and an informal poll conducted by a local barber, who appears to have done a "Saturday man in the barber chair" inquiry, revealing that of 19 persons questioned, 16 had read something in the newspaper about the murder and appeared to the barber to think Mooney guilty, whereas three "had more or less said they didn't care one

way or another." Additionally, Mr. Tolley, one of Mooney's defense attorneys, testified that in his opinion an impartial trial could not be had in Clarke County.

A further group of about four articles, published in January and April, 1978, were also introduced in support of the motion, but we see nothing objectionable in them. They merely reported pretrial motions, rulings made on them, and the date trial was to begin.

It is provided in Code Ann. § 27-1201 that a trial judge may order a change of venue where an impartial jury cannot be obtained. The test on appeal is whether the trial judge abused his discretion in denying the change of venue. *Potts v. State,* 241 Ga. 67, 76 (243 SE2d 510) (1978).

Mooney first argues that his motion for change of venue should have been granted *before voir dire,* on the ground that an impartial jury could not be selected from the community. This invokes the concept of presumed prejudice, and is separate from the post-voir dire motion for change of venue considered later. He urges our adoption of the American Bar Association Standards Relating to the Administration of Criminal Justice, Fair Trial and Free Press, Change of Venue, § 3.2 (1968). Those standards recommend granting the motion where "because of the dissemination of *potentially prejudicial* material, there is a *reasonable likelihood* that in the absence of such relief, a fair trial cannot be had." (Emphasis supplied.)

This standard has not been adopted in Georgia and we decline to do so today. We will follow the decisions of our court and of the United States Supreme Court.

In Murphy v. Florida, 421 U. S. 794 (1975) the Supreme Court discussed Rideau v. Louisiana, 373 U. S. 723 (1963), Estes v. Texas, 381 U. S. 532 (1965) and Sheppard v. Maxwell, 384 U. S. 333 (1966) in which the court found that pretrial publicity had so "pervaded the proceedings" that prejudice could be presumed. 421 U. S. at 798. Rideau involved a defendant who confessed on television; in Estes the press turned the trial into "a circus atmosphere"; and Sheppard "accommodate[d] the public appetite for carnival. . ." 421 U. S. at 799.

Analyzing the facts before us, we find that this

murder attracted inevitable newspaper attention; it involved a victim of local prominence; and the pretrial proceedings which were reported during September through November, 1977, referred to evidence against Mooney which was quite damaging. (We recognize that merely being indicted is "damaging" in the sense that we use the word.) We also find that, with variations only in minor details, the evidence referred to was that actually introduced at trial; these damaging articles did not appear within five months of the trial; and the articles were factual and not hysterical or inflammatory. *Welch v. State,* 237 Ga. 665, 668 (229 SE2d 390) (1976). These facts are quite different from those of Rideau, Estes and Sheppard. In *Chenault v. State,* 234 Ga. 216, 222 (215 SE2d 223) (1975) we found no abuse of discretion in the trial court's refusing to change venue where "one of the victims is a well-known and highly respected person and substantial publicity surrounded the offense. . ." As the Eighth Circuit noted in United States v. McNally, 485 F2d 398, 403 (8th Cir. 1973) cert. den. 415 U. S. 978 (1974) (quoted in *Coleman v. State,* 237 Ga. 84, 87 (226 SE2d 911) (1976)), "Just because, however, there has been widespread or even adverse publicity is not in itself grounds to grant a change of venue."

It follows that on this evidence there was no reason to presume prejudice, and the trial court did not abuse its discretion in refusing Mooney's pre-voir dire motion to change venue. We find United States v. Herring, 568 F2d 1099 (5th Cir. 1978) distinguishable because the front page newspaper headlines involved there, reporting death threats against and heavy guard around a chief prosecution witness, appeared on the third morning of the trial when the jury was unsequestered, and the trial judge refused a defense motion to question the jury to determine the extent of their exposure to and response to the article.

Considering whether Mooney's post-voir dire motion to change venue was correctly denied, we again find the test set out in Murphy v. Florida. "The constitutional standard of fairness requires that a defendant have 'a panel of impartial, "indifferent" jurors.' *Irvin v. Dowd,* 366 U. S. at 722 [81 SC at 1642]. Qualified jurors need not,

however, be totally ignorant of the facts and issues involved. 'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' *Id.,* at 723 [81 SC at 1642] At the same time, the juror's assurance that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.' *Ibid.*" Murphy v. Florida, 421 U. S. 794, 799-800 (1975).

Despite Mooney's contention that 56 out of 66 jurors questioned had heard or read something about the case, our review of the voir dire transcript, which covers almost 700 pages, shows that the few who had formed opinions were excused and the remainder, including those who actually served on the jury, revealed nothing making their impartiality suspect. Compare *Presnell v. State,* 241 Ga. 49, 53 (243 SE2d 496) (1978) (39 of 46 jurors examined had read of or discussed the case).

We have canvassed this general issue recently in *Coleman v. State,* 237 Ga. 84, 86-93 (226 SE2d 911) (1976), and *Street v. State,* 237 Ga. 307, 308-311 (227 SE2d 750) vacated on other grounds, 429 U. S. 995 (1976), modified, 238 Ga. 376 (1977). We find that the trial court did not abuse its discretion in denying the motion to change venue after voir dire, because Mooney had made no showing that the jury selection process showed actual prejudice to a degree that rendered trial fundamentally unfair. Murphy v. Florida, 421 U. S. at 799; *Potts v. State,* 241 Ga. 67, 76-77 (243 SE2d 510) (1978).

*3. Confrontation — Elmo Florence*

Mooney next urges that the trial court erred in permitting the witness Reinhold to testify under Code Ann. § 38-306 to the substance of statements made by Elmo Florence implicating himself and Mooney in the Harty killing. Reinhold testified that while he and Florence were drinking beer at a bar one night, Florence

told him details of the killing, saying he had been paid by Mooney to do it, and appeared to be seeking further employment as a paid killer by bragging of his success. In part, this was the testimony: "A. ... Elmo started making implications that he was in another type of business other than Florence Electric. And he went on to tell me that if I ever needed anything, I shouldn't call New Jersey; I'm from New Jersey. He said you're from New Jersey and you know what goes on in New Jersey. If you ever have any trouble, don't call New Jersey; call me. I do a good clean job. Q. And did he tell you what he was talking about?" A. He said: I'm a hit man. I'm a hit man, baby, and I ain't bullshitting you. . . . [Florence then said he was the person who had killed Harty. He provided details which seemed convincing to Reinhold.] ... A. I asked him — you know — why did you kill him? and he goes: because I'll tell you, baby, I'm a hit man. I was hired to do it. And I said: Who hired you? And he said John Mooney... John Mooney from Somebody's Pizza. . . T. K. was going to throw this young kid out of the station. John Mooney was going to lose his whole livelihood because T. K. was going to throw him out. I asked him how much he got paid. Elmo stated he got paid $5,000 to $10,000... After that he stated. . . I don't worry about telling you because you know what goes on. And if anything should happen to me, my partner John knows who I'm talking to and why I'm talking to you. If anything should happen to me, my partner John knows who to come take care of."

Mooney argues that the admission of this testimony containing the out-of-court statements of Florence, who was not a trial witness, incriminating him, (Mooney) violated his confrontation rights under the Sixth Amendment and Code Ann. § 38-414 which states that "the confession of one joint offender or conspirator, made after the enterprise is ended, shall be admissible only against himself."

We find that Code Ann. § 38-414 is not involved here, because Florence was making no "confession" within the meaning of that section, nor had the enterprise "ended." Instead, this testimony is permitted by Code Ann. § 38-306, sometimes referred to as the co-conspirator exception to the hearsay rule, which states that "after the

fact of conspiracy shall be proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all." It is well established that the duration of the conspiracy includes its concealment phase, and that this application of the statute is not subject to objection as a denial of confrontation. Dutton v. Evans, 400 U. S. 74 (1970). Mooney urges that Dutton v. Evans is distinguishable because there the statements were not "crucial" or "devastating," 400 U. S. at 87, whereas Florence's statements were clearly harmful. We conclude that this is not the thrust of the Dutton v. Evans ruling. Instead, that Court enumerated certain "indicia of reliability," including the spontaneity of the statement and the fact that it was against the speaker's penal interest to make it.

The Court furthered this analysis in Mancusi v. Stubbs, 408 U. S. 204, 213 (1972): "The focus of the Court's concern has been to insure that there 'are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant,' Dutton v. Evans, supra, at 89, and to 'afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement,' California v. Green, supra, at 161. It is clear from these statements, and from numerous prior decisions of this Court, that even though the witness be unavailable his prior testimony must bear *some* of these 'indicia of reliability' referred to in Dutton." (Emphasis supplied.)

Those indicia were that the statement was non-narrative (this is not true of Florence's statement); that the declarant (Florence) is shown by the evidence to know whereof he speaks; that the witness (Reinhold) is not apt to be proceeding on faulty recollection; and that the circumstances show that declarant had no apparent reason to lie to the witness. See Dutton v. Evans, supra. The final three indicia are present here.

The concealment phase of this conspiracy between Florence and Mooney was plainly still continuing. Florence's further statements to Reinhold thanked him "because you let me in on some stuff" concerning what the feeling was in the town about the killing, "and you also

gave me a place to leave something. And now I've picked it back up." It was a wad of money. Additionally, Florence threatened Reinhold with dire consequences if he revealed what he was told.

This is not a "confession" which will end the concealment phase of a conspiracy, and several indicia of reliability are present. There is absolutely no chance here for the kind of corruption of justice that could flow from the use of statements made to police officers incriminating oneself and others. See, e.g., *Price v. State,* 239 Ga. 439 (238 SE2d 24) (1977); *Crowder v. State,* 237 Ga. 141 (227 SE2d 230) (1976). Finally, this is the kind of out-of-court statement which is apt to throw great light upon the question of guilt. As a concurring justice wrote in Dutton v. Evans, "Judging the Georgia statute here challenged by the standards of due process, I conclude that it must be sustained. Accomplishment of the main object of a conspiracy will seldom terminate the community of interest of the conspirators. Declarations against that interest evince some likelihood of trustworthiness. The jury, with the guidance of defense counsel, should be alert to the obvious dangers of crediting such testimony. As a practical matter, unless the out-of-court declaration can be proved by hearsay evidence, the facts it reveals are likely to remain hidden from the jury by the declarant's invocation of the privilege against self-incrimination. In light of such considerations, a person weighing the necessity for hearsay evidence of the type here involved against the danger that a jury will give it undue credit might reasonably conclude that admission of the evidence would increase the likelihood of just determinations of truth." 400 U. S. at 99 (Harlan, J., concurring).

The admission of Reinhold's testimony was authorized by Code Ann. § 38-306, and did not violate Mooney's confrontation rights under the state and federal constitutions. See *Moore v. State,* 240 Ga. 807, 817-818 (243 SE2d 1) (1978); *Knight v. State,* 239 Ga. 594 (238 SE2d 390) (1977) and cits.

### 4. Testimony of Stephen Florence

Mooney next argues that the court erred in permitting Stephen Florence, nephew of Elmo Florence,

to testify to a jailhouse conversation with Elmo and to certain other statements made by Elmo. The first contention, that Stephen's testimony was excludable as the fruit of the poisonous tree of the allegedly illegal searches of Mooney's luggage, must fail, in light of our holding that the searches were not illegal.

Stephen testified to a transaction in which he went with Elmo to Elmo's store in Atlanta accompanied by a man Stephen identified as the defendant Mooney. Elmo sold to Mooney a snub nosed .38 calibre gun, and Mooney seemed nervous as he paid. Elmo described the gun as "hot." After Mooney had left, Elmo explained to Stephen that the man bought the gun because he was under a lot of pressure about someone to whom he owed money and he needed to kill that person to avoid paying.

Later, Stephen visited his uncle Elmo in jail where Elmo was charged with murder. They spoke by telephone as they were separated by a glass partition. Elmo gave him a message written down on a pad which read "don't identify him."

The written message is attacked as inadmissible, on the ground that it is inherently unreliable, was made after the conspiracy had ended, and that the conspiracy was never proved.

A conspiracy or the concealment phase of it does not necessarily end just because one or more participants have been arrested and jailed. Dutton v. Evans, supra (statement made to a fellow prisoner held admissible). Under the rationale of division 3 hereof, this testimony did not violate Mooney's confrontation rights.

The assertion that a conspiracy was never proved by admissible evidence and therefore no predicate existed for the admission of this evidence as a co-conspirator's declaration, is without merit. With respect to the reliability of Stephen's conjecture that Mooney was the man to whom the note had reference, we note that this conjecture was made with the jury out of the courtroom. All the jury heard was that Elmo presented the note saying "don't identify him," and after talking "about other stuff" Stephen left. However, during questioning with the jury out, Stephen's answers were that his uncle had first asked if he had seen a lineup, then shown him the

note, and that Stephen could not remember whether Elmo had mentioned Mooney by name, but he was certain that the man referred to was the man to whom Elmo had sold the gun — Mooney.

The objections to this evidence were properly overruled.

### 5. *Testimony of Joy Grizzle*

Mooney's fifth enumeration of error urges that the trial court erred in admitting certain testimony of Joy Grizzle, a friend of the victim. She testified that when Harty failed to show up for their date, she quickly investigated and discovered the body, because of a telephone conversation she had previously had with him. He had indicated to her that he was feeling apprehensive about threatening calls and arson, and said he had had a telephone conversation with John Mooney concerning the eviction notice and that Mooney had seemed hostile.

The state introduced this testimony under Code Ann. § 38-302 to explain her conduct, and Mooney's argument that the testimony was inadmissible is pitched mainly on this sentence from *Arnold v. State,* 236 Ga. 534, 536-537 (224 SE2d 386) (1976), discussing the application of Code Ann. § 38-302: "Although the better practice is to bring out the fact of the conversation without relating the exact words used, where the details are given there is no reversible error *unless the words are prejudicial. Kelly v. State,* 82 Ga. 441 (9 SE 171) (1889)." (Emphasis supplied.) Mooney argues that here the words were prejudicial, and therefore under *Arnold* the testimony was inadmissible. That is incorrect. *Kelly v. State* does not hold and *Arnold* should not be read to rule, that Code Ann. § 38-302 will not allow introduction of prejudicial evidence. That is not the law of this state, e.g., *Lloyd v. State,* 139 Ga. App. 625 (229 SE2d 106) (1976). In fact, the prejudicial nature of such evidence is largely irrelevant unless the testimony offends some other rule of evidence, which was the claim which Arnold made—he argued that it put his character in issue. 236 Ga. at 537. *Arnold* does not support Mooney's claim of error here.

The jury were instructed more than once that this evidence was to be used only to explain the witness'

conduct. We see no basis for Mooney's further assertion that somehow this telephone conversation went to the jury as an admission by him which he had never had the opportunity to challenge. Mooney's confrontation rights were not violated by this testimony. *Harrell v. State,* 241 Ga. 181 (243 SE2d 890) (1978). See also *Bell v. State,* 141 Ga. App. 277 (233 SE2d 253) (1977).

### 6. Color Slides of Victim

Mooney next claims error in the trial court's allowing into evidence a series of 19 color slides of the victim's body. Some slides depicted the victim as he was found slumped over his desk; some showed the face and the exit wound in the right forehead after the victim was turned face up; some showed the course of blood stains down his leg and arm and on the Persian rug; and some were made in the morgue showing the bullet entry wound in the back of the head, with the victim's hair pulled back for viewing.

"Georgia law is abundantly clear that a photograph which is relevant and material to the issues in the case is not excludable on the ground that it would inflame the minds of the jurors to see it. [Cits.]"*Stevens v. State,* 242 Ga. 34, 38 (247 SE2d 838) (1978). "It is well settled that photographs which do have probative value in establishing the cause of death, although gruesome and only corroborative or cumulative of other evidence, are entitled to admission." *Teal v. State,* 122 Ga. App. 532 (177 SE2d 840) (1970).

The slides were relevant to the issues in the case, including but not limited to corroboration of Florence's account of how the killing was done. They were not unduly gruesome, and the fact that they were somewhat repetitive and that in some the body had been moved, will not alone rule them out. The trial court did not err in admitting these photographs. *Godfrey v. State,* 243 Ga. 302 (1979); *Davis v. State,* 240 Ga. 763, 766, 767 (243 SE2d 12) (1978); *Reddish v. State,* 238 Ga. 136 (231 SE2d 737) (1977); *Edwards v. State,* 233 Ga. 625, 627 (212 SE2d 802) (1975).

### 7. Challenge to Jury Array

There is no merit to Mooney's contention that the jury array was improper in that young persons aged 18 to 21 were underrepresented. We have repeatedly held that

this age group does not constitute a recognizable class for purposes of jury selection. *Hudson v. State,* 240 Ga. 70 (239 SE2d 330) (1977) and cases cited therein. Mooney argues that Clarke County, Georgia, as the seat of the University of Georgia, has a higher than usual percentage of such persons in the population. This fact does not change the outcome here. The conclusion that 18 to 21-year-olds are not a recognizable class for jury selection purposes is not based on the proposition that they form only a small numerical segment of the community, but that their attitudinal segment of the community has never been shown to be unique or significant, nor are they a traditionally discriminated-against class. See *Payne v. State,* 233 Ga. 294, 308-309 (210 SE2d 775) (1974).

The failure of the jury commissioners to revise the jury array in accordance with Code Ann. § 59-106 for a period of three years and eight months will not alone invalidate the jury. *McHan v. State,* 232 Ga. 470 (207 SE2d 457) (1974); *Haden v. State,* 176 Ga. 304 (168 SE 272) (1933).

### 8. Identity of Police Tipster

In his final enumeration of error Mooney alleged that the trial court erred in refusing to order the state to reveal the identity of a person who supposedly revealed to police that he had heard that Harty sold marijuana and hard drugs and was killed in connection with a drug deal. In response to Mooney's Brady motion, a hearing was held resulting in the trial court's decision that the individual in question was a mere tipster whose identity need not be divulged.

We agree with the trial court. The transcript of the hearing at which the officer testified reveals that the tipster had no personal knowlege of the crime and was merely repeating the conversation of an unknown person he had overheard at a party. The officer stated that the person had never given information before and wished to be anonymous, and also that his information was not supportable by any evidence the police were able to uncover.

The state was empowered to refuse to identify him, under Code Ann. § 38-1102, on the ground that his

contribution was not material to the defense on the issue of guilt or punishment. Roviaro v. United States, 353 U. S. 53 (1957); *Moore v. State,* 240 Ga. 807, 815 (243 SE2d 1) (1978); *Thornton v. State,* 238 Ga. 160 (231 SE2d 729) (1977).

Mooney's final argument on this point is that if the tipster may not be identified, at least the jury should be allowed to hear the officer's recitation of what the tipster's information had been. The trial court did not err in refusing the admission of this hearsay. ". . .[I]f the state *proves* to the court's satisfaction that the informer is a pure tipster, who has neither participated in nor witnessed the offense, any evidence he might offer would be hearsay and inadmissible. Thus, the tipster's identity could not be material to the guilt or innocence of the defendant under Brady or be relevant and helpful to the defense under Roviaro." *Thornton,* supra, 238 Ga. at 165.

The trial court's rulings on this point did not violate Mooney's civil rights under 42 USC § 1983 nor his constitutional right to confront witnesses against him.

All enumerations of error having been examined and found without merit, Mooney's conviction for murder and sentence to life imprisonment are affirmed.

*Judgment affirmed. All the Justices concur, except Hill, J., who concurs in the judgment only.*

ARGUED JANUARY 16, 1979 — DECIDED MARCH 15, 1979 — REHEARING DENIED MARCH 28, 1979.

*Cook, Noell, Bates & Warnes, Edward D. Tooley, Joe Salem,* for appellant.

*Harry N. Gordon, District Attorney, B. Thomas Cook, Jr., Assistant District Attorney, Arthur K. Bolton, Attorney General, Nicholas G. Dumich, Staff Assistant Attorney General,* for appellee.