## 36340. KNOWLES v. THE STATE.
## 36341. LONGSHORE v. THE STATE.
## 36342. THOMPSON v. THE STATE.

UNDERCOFLER, Chief Justice.

These appeals are from convictions for murder and sentences of life imprisonment. Sara Bell Longshore is the widow of the victim, Jimmy Bernard Longshore. Eula Belle Knowles is her mother and Emmett L. Thompson is her mother's brother. The State prosecuted the appellants jointly as co-conspirators. Appellants did not testify.

The evidence was essentially as follows:

Approximately 8:00 a.m. on Sunday, October 28th, the victim, Jimmy Longshore, a resident of LaGrange, received a telephone call from an unidentified caller asking about a car Longshore was trying to sell. A second call was received about 1:30 p.m. and at the conclusion of the conversation the victim told his family he was going to the Day's Inn located on I-85 outside of LaGrange to meet the potential purchaser. When both calls were answered by the victim, the victim's daughter, twelve-year old Isabelle, simultaneously answered the phone. She could not recognize the voice and did not hear her father identify the caller by name.

Sunday evening the victim had not returned. Sara Longshore cooked dinner for her husband and left for evening church activities. Bernard (Buster) Longshore, the victim's son, acknowledged that his father, the manager of the AVCO Finance Company in LaGrange, would occasionally go "chasing" bad accounts on Sundays, and when the victim had not returned that evening, there was apparently no immediate concern.

The victim failed to return home that night. At 4:00 a.m. on Monday, October 29th, Sara Longshore called Jerry Smith, a co-worker of her husband. Smith stated he had not seen Jimmy and knew nothing of his going to Pine Mountain "chasing." Linda Smith, another co-worker, was called around 4:00 a.m. by both Jerry Smith and Sara but she indicated she knew nothing of the whereabouts of the victim. Several other calls were made by Sara to the AVCO office later that morning in an attempt to locate her husband.

In the afternoon of the 29th, Sara and Bernard Longshore drove to the Day's Inn looking for Jimmy. They found his car at the rear of the motel. The hood latch was ajar, the driver's window was open and the floor mats were uncharacteristically dirty and in disarray. Bernard drove the car home and the police were called.

At 6:30 p.m. on Monday the 29th, Terry Webb began loading hay into an old barn located off the Waldrop Road, ten or eleven miles from LaGrange and seven miles from the Day's Inn at I-85. The barn

is located seventy-five yards off the road with a dirt driveway leading to the entrance. As he backed his tractor into the barn, he ran over something he subsequently discovered to be the body of Jimmy Longshore.

Detectives were summoned and arrived on the scene shortly thereafter. Both Don Mallory and Jerry Bryant, sheriff's deputies, conducted a preliminary investigation. There were no eyewitnesses, no footprints or tireprints, nor was a weapon discovered. The victim had two bullet wounds in his head and it appeared that he had been struck by a blunt instrument. The medical examiner subsequently verified the cause of death but there was no evidence related to the time of death; i.e., whether death had occurred on the 28th or the 29th.

The Sheriff of Troup County, L. W. Bailey, on the evening the body was found, talked with Sara Longshore. She was not under suspicion at that time. Two days later, however, both Sara Longshore and Eula Knowles made statements to the detectives after being advised of their rights. Until the statements were made there had been no mention of Emmett L. Thompson.

Sara Longshore made two statements — one written and the other tape recorded. Sara's verbatim written statement is as follows:

"Jimmy and I had gone back together in May 1979 and Jimmy started doing the same things that he was doing prior to our previous separation. That is he was doing things to mentally to stress me. He was doing anything to make me think that I was loosing my mine, like tapping on the bed after the light were out and waking me up in the middle of the night and telling me that I was loosing my mine. It got so bad that two weeks ago Isabelle ask me please lets me and her get everything and leave. I had been to Doctor Hall and he realized the state of mine that I was in. Dr. Hall advised me to put Jimmy's ass out and Buster's ass out. Dr. Hall advised me that if I remained under the stress I would or he would be filling out papers to send me mental hospital within a month. I put Jimmy out first then I put Buster out. From there Buster got so messed up on drugs I took Buster back in. Then Buster got to writing so many bad checks on me that I had to ask him to leave. Buster was then picked up and sent to the Turning-Point in Columbus, Georgia for drug treatment.

"Prior to May 1979 while Jimmy and I were separated there were so much harassment at the office from Jimmy that the thought came up from Calvin Enmon that I ought to do something about Jimmy. I told Calvin that I felt I could just blow his head off and as the conversation went along Calvin give me the impression that he would kill Jimmy for me. Calvin said he would do so we discussed how much money and he said he would do it for twenty-five hundred

dollars. We discussed this on or during the week and then on that weekend Calvin called on Sunday and said he needed something at the office. When I met him down there Calvin beat me and raped me. The following Tuesday I went to the West Georgia Medical Center Emergency Room and had X-rays taken. This was about two months ago. About two weeks ago I called my uncle Emmie Thompson in the Atlanta, Georgia area and he met me at the Farmers Market in Atlanta and we discussed having Jimmy my husband killed which was on October 24, 1979. My uncle Emmie told me he would have it done but he would not do it himself. Then on Thursday October 25, 1979 at approximately mid-day my uncle Emmie called and said that he had not been able to get in touch with anybody and if he did he would call back. The first time I called my uncle Emmie he said that most people that done things like that who were professionals charged ten-thousand dollars and it would have to be paid within two weeks. My uncle Emmie had said that he would call back when he found someone he would call but he never did so when the phone calls came for Jimmy Sunday October 29, 1979 I didn't think much about it until Monday morning. I realized what had happened when Jimmy's body was found Monday evening."

The tape recorded statement differed in several respects. Sara additionally related, after questions were propounded to her, the matter of insurance on the life of her husband, that a policy had been taken out in March 1979. No mention was made by Sara, in either her written or her oral statements, that insurance proceeds were to be the means to pay for the murder of her husband or that Emmett L. Thompson knew anything about insurance or the amount of the proceeds payable upon Jimmy's death.

In the taped statement, Sara recounted in detail the proposition she and her mother Eula made in August of 1979 to Calvin Inmon to kill her husband. That agreement, in essence, was that Calvin Inmon would kill Jimmy for $2,500.00, but the deal was terminated when Calvin raped her.

Sara further stated that she "contacted" Ralph Mathews, Cecil Dennis and Florence Shepard on various occasions within the previous six months with similar propositions to kill her husband.

With reference to the co-defendant, Emmett L. Thompson, she stated the following on tape:

"Q You had some relatives in Atlanta that you contacted, what uh, tell us about that. A O'kay, I uh, uh . . . during the time, okay, when Jim came back home. Jimmy picked right back up with the mental, uh, stress, in things of thinking, that making me think that I was going to lose my mind and it got, I thought that things would get better and then it got to the point that I couldn't stand it anymore. I

really thought I was losing, totally losing my mind. So, I contacted my Uncle Emmie Thompson, in the Atlanta area. We met at the Farmer's Market in the Smorgasbord, had lunch and he said he would call me back later. Well, I got the impression, then that he really didn't want to have anything to do with it. Now that's the truth. Q What did you tell him when ya'll met? Didn't you tell him that ya'll had to do something? A I just told him that mentally, Jimmy was putting me through, through, so much hell and that I had already been to the doctor once and came close to a complete nervous breakdown. That I just did not feel like, that I could cope with this problem any longer. Q Did you tell him, did you tell him, though, that you, the words used that you needed a hit man? A I ask, I told him that when Jimmy was away from me, when we were separated, he asked me, if I would just divorce him, you know . . . getting divorced again. And I said, that when we were divorced, Jimmy would never leave me alone. He always followed me and just did crazy things and I told, I told my Uncle that . . . . uh, I wanted, someone, that, uh, to put out a contract for Jimmy. Q What did he say then? At this time, you hadn't told him who for, had you? A I told him for Jimmy . . . Q O'kay. A . . . and he said that he would have to call me back. That was on Wednesday. The uh . . . Detective Mallory: The 24th? A The 24th. On the 25th, he called me back and said that he had not been able to get in touch with anybody, but that if he did, he would call, but he never did call back. Detective Bryant: Q When did he tell you about the price, that it would cost? A The first time, that I contacted him, which was probably the 22nd well no, which was probably, uh, about the 18th or 19th. Q He then quoted you, what it would cost you. A He said, 'Sara,' he said, 'I don't think you want to do anything like that,' he said, 'do you know that professionals charge $10,000.00.' Q Did he tell you, what, did he tell you about doing anything like that? Did he tell you that was dangerous business? A He said, that I should think about it. Q O'kay. And he said the price was what? A $10,000.00 Q What did you tell him then? A I told him, I said, well you know, that's when I told him to meet me, meet us, at the Farmer's Market and we would just talk. Q O'kay. Who went with you to the Farmer's Market? A My mother. Q And she was on the conversation, in on the conversation? A Yes. Detective Mallory: Q And, Mr. Thompson, is your mother's brother, is that correct? A Uh-huh. Detective Spratlin: Q Well, when did he tell you how soon the money had to be paid and what was and how was the money . . . A within about two weeks. Q After, after, Jimmy was killed they would have to be paid within two weeks, did he say, tell you how it would have to be paid? A He didn't say, he never called me back to tell me anything. Detective Bryant:

Q Did you tell him, you could handle that? A I told him I would get the money someway."

Eula Knowles' verbatim written statement signed the same day as Sara's is as follows:

"On or about last of August Sara Longshore called me and ask me if I wanted to go have a sandwich so I went over to her place of employment on South Dawson Street at Cutrer Inc. around five o'clock in the afternoon. Calvin the black man who also worked at Cutrer said something to Sara about two-five and look Sara I'm under probation I can't afford to talk. Sara and I left and got sandwiches. Last Wednesday a week ago Sara had an appointment with a doctor in Atlanta or East Point so we went to The Farmers Market and had lunch with my brother Emmie L. Thompson. While Sara and I were eating Emmie came in and sit down. Sara and Emmie discussed having Jimmy Longshore killed and Emmie told Sara give him a couple of days and he would call. We got back to LaGrange and I believe Emmie called on either Thursday or Friday at Sara's house. She had given him her number. I was not over at her house when he called but Sara called me and told me that she had got a phone call Emmie. Sara said that Emmie had said that he had found a guy for ten. I told her I thought that was a little steep but the way Jimmy had mistreated Sara for the last four years especially the last two months and the last two weeks was unbearable. Q Do you happen to know how Sara was to make payment for having Jimmy killed? A I do not. Q When did you realize that Emmie had fulfilled that contract? A I still don't know who done it. Q You do know that Emmie was trying to find someone to kill Jimmy? A Yes, and I do know that Calvin was also. Q Have you paid any money to anyone for killing Jimmy? A No I have not. Q Do you know if Sara has paid anyone for killing Jimmy? A No."

As a result of these statements, a warrant for murder was taken for Emmett L. Thompson who was arrested on November 5, 1979, at his home in Cumming, Georgia. He was transported to the Troup County jail and questioned in the early morning hours of the same day. He refused to sign a waiver of rights and requested an attorney. Later that same morning and again several days later, he was questioned and he made statements that he "was not close to his people down here in LaGrange and that he didn't have much contact with them," didn't have "any contact" with them, and he "didn't have any relationship with them, the only time they ever associated was at a family reunion and the Longshore family always seemed to be a little — have a lot of everything else and they didn't have any relationship."

Detectives fingerprinted the victim's car and found nine

unidentified latent palm and fingerprints on the vehicle. The attempted match with Emmett L. Thompson was negative. The prints were not compared to those of Cecil Dennis, Ralph Mathews, Florence Shepard, Calvin Inmon or anyone else. Handwriting samples were taken of Emmett L. Thompson but were not matched to any document.

Detectives photographed Emmett L. Thompson upon his arrest on November 5th in accordance with normal booking procedures. Those photographs were taken to the Day's Inn Motel and Annie Slaughter and Vinnie Mingo stated that they had seen the person pictured at about 1:00 p.m. on October 29, 1979, in and around Annie Slaughter's car. They similarly identified Thompson at this trial.

The phone records of each defendant were subpoenaed by detectives (and produced at trial). Trial testimony regarding the records revealed the following:

(a) Calls billed to the telephone of Emmett L. Thompson for calls to the telephone of Sara Longshore: (1) two calls on October 26, 1979; (2) one call on August 18, 1979; (3) one call on July 17, 1979; and (4) one call on May 19, 1979.

(b) There were no calls billed to Sara Longshore's telephone for calls to the telephone of Emmett L. Thompson.

(c) Calls billed to the telephone of Eula Knowles for calls to the telephone of Emmett L. Thompson: April 12, April 23, May 7, June 26, July 28, July 31, August 24 and October 23, 1979.

(d) Calls billed to the telephone of Emmett L. Thompson for calls to Eula Knowles' telephone on August 18, 1979.

Jimmy Longshore had taken out life insurance policies during his marriage wherein the beneficiary was his wife, Sara. The latest policy was a joint policy for $70,000.00, double indemnity, which had been taken out in March, 1979. There were two policies totaling $6,000.00 on the victim's life taken out in 1961 and 1965. Additionally, there existed a decreasing term policy, taken out in May, 1974, with Sara as beneficiary, which had a face amount adjusted by October, 1979, of $25,924.61. AVCO Finance had another group policy on the victim payable to his wife for $30,000.00. No evidence was discovered (or presented) that Emmett L. Thompson knew of any of these policies of insurance, nor that the proceeds of the insurance were to be used to pay for the murder of Jimmy Longshore.

Sara Bell Longshore and Eula Belle Knowles filed identical enumerations of error as follows:

1. The trial court did not abuse its discretion in overruling motions for change of venue based upon pre-trial publicity. The transcript of voir dire shows that almost every juror empaneled had read or heard of the case through newspaper, radio and television

reporting as well as by word-of-mouth, for the murder of Jimmy Longshore created considerable community interest. Further, the exhibits show that the revelations by the sheriff of Troup County, as the investigation unfolded, provided most of the factual basis for the reports published, and several of them included the sheriff's opinion raising inferences as to the guilt of the accused. However, we find no inherently prejudicial setting of the trial and the publicity apparently had little effect upon fixing the opinions of the empaneled jurors. Those chosen clearly stated they considered what they had heard as "rumors." They affirmed that they had formed no opinions in the case; they stated they could weigh the evidence presented fairly and impartially; and they stated they could make independent decisions as to the guilt or innocence of the multiple defendants, even though the defendants were related. There was no error. *Coleman v. State,* 237 Ga. 84, 90 (226 SE2d 911) (1976); *Street v. State,* 237 Ga. 307, 308 (227 SE2d 750) (1976); *Mooney v. State,* 243 Ga. 373, 385 (254 SE2d 337) (1979); *Brooks v. State,* 244 Ga. 574, 576 (261 SE2d 379) (1979).

2. It was not error to deny a motion in limine seeking to exclude evidence of Calvin Inmon's alleged sexual assault of Sara Bell Longshore and evidence of various insurance policies on the life of the victim. We conclude the evidence was admissible to show Sara Bell Longshore's scheme, plan, motive and intent. It is noted the evidence as to the insurance policies was admitted only against appellant Longshore.

3. The photographs of the body of the victim showing its location when found and various aspects of the wounds causing death were relevant and material to show Jimmy Longshore was bludgeoned and shot twice in the head. *Stevens v. State,* 242 Ga. 34, 38 (247 SE2d 838) (1978).

4. The trial court did not err in admitting into evidence the incriminating statements of appellants Longshore and Knowles. The evidence submitted at the Jackson-Denno hearing and to the jury supports a finding that appellants waived their Miranda rights and gave the statements freely, voluntarily, and without the slightest hope of reward. We find also that there was ample independent evidence of conspiracy to murder Jimmy Bernard Longshore. Code Ann. § 38-306. It is not necessary to decide whether the conspiracy had ended at the time the statements were given. Each statement was admissible against the individual appellant who gave it. *Jones v. State,* 245 Ga. 592, 597 (266 SE2d 201) (1980). The statements were interlocking and thus there was no Bruton error of confrontation. Parker v. Randolph, 442 U. S. 62 (99 SC 2132, 60 LE2d 713) (1979).

5. The trial court did not err in admitting references concerning

alleged extra-marital sexual relations by Sara Longshore where, as here, it was independently relevant to show motive, scheme, intent, or identity. *Hanson v. State,* 143 Ga. App. 200 (237 SE2d 699) (1977).

6. It was not error to deny the motions for directed verdict of acquittal. The State's evidence was sufficient to show a conspiracy to murder the victim was formed by these appellants for financial gain. Whether or not the circumstances are sufficient to exclude every reasonable hypothesis other than the guilt of the accused primarily is a question for the jury, and this court will not disturb the jury's verdict unless that verdict is unsupportable as a matter of law. *Anglin v. State,* 244 Ga. 1 (257 SE2d 513) (1979).

7. We have reviewed the enumerations of error complaining that certain evidence was hearsay, the pre-trial identification procedures were unlawful, and the trial court erroneously refused to give certain requested charges. We find these complaints without merit.

8. The evidence was sufficient to authorize a rational jury to find appellants Sara Bell Longshore and Eula Belle Knowles guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

Emmett L. Thompson filed separate enumerations of error as follows:

9. The trial court did not err in denying the motion for change of venue. See Division 1.

10. We find the pretrial identification of Thompson by witnesses Mingo and Slaughter was not impermissibly suggestive. See Division 7.

11. The introduction in evidence of appellants Longshore and Knowles' incriminating statements denied appellant Thompson the right to be confronted by these persons and to subject them to cross examination. The statements were crucial to the case against Thompson, their impact was devastating, and we do not find sufficient indicia of reliability to excuse confrontation by the declarant. *Mooney v. State,* 243 Ga. 373, 385, supra. Without them the only evidence against Thompson are telephone calls between the residences of the appellants and the fact that Thompson was seen at Day's Inn where the victim's car was found. Accordingly, Thompson's conviction must be reversed and a new trial granted. Bruton v. United States, 391 U. S. 123 (88 SC 1620, 20 LE2d 476) (1968).

12. The evidence may not be the same on retrial and therefore no ruling is made as to the sufficiency of the evidence to support the verdict. See *Johnson v. State,* 186 Ga. 324 (197 SE 786) (1938); *Hall v. State,* 244 Ga. 86, 94 (259 SE2d 41) (1979).

13. Thompson's statement that, "he was not close to his people down here in LaGrange and that he didn't have much contact with them" was inadmissible because it was made after his arrest and after he said he didn't want to say anything and wanted a lawyer.

14. The remaining enumerations of error relate to matters not likely to arise on retrial and are not addressed.

*Judgments affirmed in Case Nos. 36340 and 36341. Judgment reversed in Case No. 36342. All the Justices concur in Case Nos. 36340 and 36341. Jordan, P. J., and Marshall, J., dissent to Division 11 and the judgment in Case No. 36342.*

ARGUED JUNE 4, 1980 — DECIDED SEPTEMBER 5, 1980 —
REHEARING DENIED SEPTEMBER 23, 1980 IN CASE NOS. 36340, 36341.

*James E. Weldon, H. J. Thomas, Jr.,* for appellants (Case Nos. 36340, 36341).

*James H. Mobley, Jr., William M. Weller,* for appellant (Case No. 36342).

*William F. Lee, Jr., District Attorney, Arthur K. Bolton, Attorney General, William B. Hill, Jr., Assistant Attorney General,* for appellee.