No. 80–5980. COLEMAN *v.* BALKCOM, WARDEN. Super. Ct. Ga., Tattnall County. Certiorari denied.

JUSTICE STEVENS, concurring.

The Court's management of its discretionary docket is a subject that merits re-examination from time to time in the light of changes that affect the business of the federal judiciary. See, *e. g., Watt* v. *Alaska, ante,* p. 273 (STEVENS, J., concurring), and *Singleton* v. *Commissioner,* 439 U. S. 940, 942–946 (opinion of STEVENS, J.). Opinions dissenting from the denial of certiorari sometimes create the impression that we review fewer cases than we should; I hold the opposite view. Today JUSTICE REHNQUIST advances the proposition, as I understand his dissenting opinion, that we should promptly grant certiorari and decide the merits of every capital case coming from the state courts in order to expedite the administration of the death penalty.

In my judgment, the Court wisely rejects this proposal.

In the last 10 months, over 90 certiorari petitions have been filed in capital cases. If we were to hear even a substantial percentage of these cases on the merits, they would consume over half of this Court's argument calendar. Although the interest in protecting the constitutional rights of persons sentenced to death is properly characterized as a federal interest, the interest in imposing the death sentence is essentially a state interest. Because the persons on death row are concentrated in only a few States, because some States have no capital punishment at all, and because the range of capital offenses differs in different States, it is quite clear that all States do not share the same interest in accelerating the execution rate. This Court's primary function is to adjudicate federal questions. To make the primary mission of this Court the vindication of certain States' interests in carrying out the death penalty would be an improper allocation of the Court's limited resources.

Moreover, one may also question whether JUSTICE REHNQUIST's proposal would accomplish its intended purpose. As I understand his proposal, it would preclude the federal district courts from granting writs of habeas corpus in any capital cases on any ground that had been presented to and rejected by this Court. Because this Court is not equipped to process all of these cases as expeditiously as the several district courts, it is most unlikely that this innovative proposal would dramatically accelerate the execution of the persons on death row.[1]

One of the causes of delay in the conclusion of litigation in capital cases has been the fact that the enactment of new

---

[1] This proposed procedure in some cases would require the Court to grant certiorari and review the merits twice, once on direct appeal and once to review state collateral proceedings. Review of the merits would certainly involve more delay than would a denial of certiorari. Moreover, JUSTICE REHNQUIST's proposal would not have any effect on the delay in those cases in which a state court's resolution of collateral proceedings on procedural grounds would bar this Court's consideration of the merits of the claims raised in those proceedings.

state legislation after this Court's decision in *Furman* v. *Georgia*, 408 U. S. 238, generated a number of novel constitutional questions. Although those questions have not been difficult for three Members of the Court,[2] other Justices have found a number of these questions sufficiently important and difficult to justify the delays associated with review in this Court. The principal delay—a matter of four years—was the period between the entry of the stays in the *Furman* litigation in 1972, and the decisions in July 1976 in *Gregg* v. *Georgia*, 428 U. S. 153, *Proffitt* v. *Florida*, 428 U. S. 242, and *Jurek* v. *Texas*, 428 U. S. 262, in which the constitutionality of the death penalty was ultimately sustained. Following that basic holding, the Court has also decided several other cases presenting substantial constitutional issues relating to capital punishment statutes;[3] presumably those issues will no longer detain the state or federal courts in their consideration of cases in which the death penalty has been imposed.[4] One therefore should not assume that the delays of the past few years will necessarily be reflected in the future if the various state authorities act with all possible diligence.[5]

---

[2] JUSTICE BRENNAN and JUSTICE MARSHALL have invariably voted to set aside the death penalty and, if my memory serves me correctly, JUSTICE REHNQUIST has invariably voted to uphold the death penalty.

[3] See *Adams* v. *Texas*, 448 U. S. 38; *Beck* v. *Alabama*, 447 U. S. 625; *Godfrey* v. *Georgia*, 446 U. S. 420; *Green* v. *Georgia*, 442 U. S. 95; *Presnell* v. *Georgia*, 439 U. S. 14; *Lockett* v. *Ohio*, 438 U. S. 586; *Bell* v. *Ohio*, 438 U. S. 637; *Coker* v. *Georgia*, 433 U. S. 584; *Dobbert* v. *Florida*, 432 U. S. 282; *Roberts* v. *Louisiana*, 431 U. S. 633; *Gardner* v. *Florida*, 430 U. S. 349; *Davis* v. *Georgia*, 429 U. S. 122.

[4] It must be emphasized that some of the delay in these cases is attributable to a congressional determination that state prisoners must exhaust state remedies prior to seeking review in federal court. See 28 U. S. C. § 2254 (b).

[5] In the case of John Spenkelink, the only person who continued to attack his sentence and who has been executed since 1976, the date of his crime was February 3, 1973, and the date of his execution was May 25, 1979. Of the more than six years between his crime and his execution, approximately 38 months was spent in the federal courts. During 17 of

The deterrent value of any punishment is, of course, related to the promptness with which it is inflicted. In capital cases, however, the punishment is inflicted in two stages. Imprisonment follows immediately after conviction; but the execution normally does not take place until after the conclusion of post-trial proceedings in the trial court, direct and collateral review in the state judicial system, collateral review in the federal judicial system, and clemency review by the executive department of the State. However critical one may be of these protracted post-trial procedures, it seems inevitable that there must be a significant period of incarceration on death row during the interval between sentencing and execution. If the death sentence is ultimately set aside, or its execution delayed for a prolonged period, the imprisonment during that period is nevertheless a significant form of punishment. Indeed, the deterrent value of incarceration during that period of uncertainty may well be comparable to the consequences of the ultimate step itself. In all events, what is at stake in this procedural debate is the length of that period of incarceration rather than the question whether the offender shall be severely punished.

How promptly a diligent prosecutor can complete all of the proceedings necessary to carry out a death sentence is still uncertain. Much of the delay associated with past litigation should not reoccur in cases that merely raise issues that have now been resolved. As is true of all other types of litigation as well, however, inevitably new issues arise that will be sufficiently important and difficult to require

those months Spenkelink's certiorari petition was awaiting this Court's determination of the constitutionality of the Florida death penalty statute in *Proffitt* v. *Florida*, 428 U. S. 242. Thus over three of the six-plus years were spent at trial, on appeal in the Florida state courts, before the Governor of Florida on a petition for executive clemency, and before the trial court on a motion to vacate, set aside, or correct a sentence. See *Spinkellink* v. *State*, 313 So. 2d 666 (1975); *Spenkelink* v. *Wainwright*, 442 U. S. 1301 (REHNQUIST, J., in chambers). These delays would be unaffected by JUSTICE REHNQUIST's proposal.

deliberation before they are fully resolved. This Court should endeavor to conclude capital cases—like all other litigation—as promptly as possible. We must, however, also be as sure as possible that novel procedural shortcuts have not permitted error of a constitutional magnitude to occur. For after all, death cases are indeed different in kind from all other litigation. The penalty, once imposed, is irrevocable. In balance, therefore, I think the Court wisely declines to select this group of cases in which to experiment with accelerated procedures. Accordingly, I concur in the order denying certiorari.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

Petitioner was convicted of first-degree murder and sentenced to death. After exhausting his direct appeals, petitioner filed this action in the Superior Court of Tattnall County, Ga., seeking a writ of habeas corpus. One of petitioner's claims was that prejudicial publicity had created an atmosphere in which a fair trial was impossible. Petitioner's counsel asserted in an affidavit that the jurors in his original trial, if called as witnesses, would "testify as to the widespread discussion of the [offense] in Seminole County . . . and to the fact that they, as jurors, were affected in their statutory decision-making process by the adverse pre-trial publicity." The affidavit further alleged that the county jury commissioners, members of the jury panels, and numerous reporters and expert witnesses would offer testimony to similar effect. In order to prove these allegations, petitioner sought compulsory process to require the witnesses to testify.

At that point, petitioner's efforts were thwarted by Ga. Code § 38–801 (e) (1978). Although that statute has since been amended,[1] at the time of petitioner's habeas hearing, it

---

[1] The statute as amended, effective February 15, 1980, permits service of process "at any place within the state." 1980 Ga. Laws 71–72. Petitioner's hearing was held prior to that date.

provided that subpoenas in habeas cases could be served only in the county in which the hearing was held or within 150 miles of that county. None of the witnesses petitioner wished to summon lived so close. As one would expect, most of them lived in or near Seminole County, where the offense was committed. Petitioner was further constrained by the provisions of Ga. Code § 50–127 (1978) to file his habeas petition in the county where he was incarcerated.[2] In sum, only the State's procedural requirement threatened to prevent petitioner from calling the witnesses who he alleged would testify in support of his claim. Consequently, petitioner asked the trial court to declare § 38–801 (e) unconstitutional and to permit him to perfect service anywhere in the State. The trial court sustained the statute and denied the petition for habeas corpus on the merits. The Georgia Supreme Court declined to grant leave to appeal. Because the availability of compulsory process to an individual challenging his death penalty raises important questions under the Due Process Clause, I would grant the petition for certiorari.[3]

A habeas corpus proceeding is, of course, civil rather than criminal in nature, and consequently the ordinary Sixth Amendment guarantee of compulsory process, which is made applicable to the States by the Fourteenth Amendment,[4] does not apply. Nevertheless, when the death penalty is in issue, the Constitution may impose unusual limitations on the States. As we emphasized just last Term in *Beck* v. *Ala-*

[2] It is true that Rule 45 (e)(1) of the Federal Rules of Civil Procedure limits service of district court subpoenas to 100 miles of the hearing site. But under 28 U. S. C. § 2241 (d) an individual has the option of filing his petition for a writ of habeas corpus in the district where the conviction occurred rather than the one where he is incarcerated. The Georgia statutory scheme challenged in this case does not include that option.

[3] Adhering to my view that the death penalty is in all circumstances cruel and unusual punishment, I would in any event grant the petition for certiorari and vacate the judgment below insofar as it leaves undisturbed the death sentence.

[4] *Washington* v. *Texas*, 388 U. S. 14, 17–19 (1967).

*bama,* 447 U. S. 625, 637 (1980), "there is a significant constitutional difference between the death penalty and lesser punishments." If an individual is imprisoned for an offense he did not commit, the error can to some extent be rectified. But if he is executed, the wrong that has been done can never be corrected. That is just one reason that I, of course, adhere to my view that the State may never put an individual to death without imposing a cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments. Yet surely those among my Brethren who believe that there are circumstances in which the State may legitimately impose this ultimate sanction would not want to see an innocent individual put to death. Certainly no Member of this Court would countenance a conviction obtained in violation of the Constitution. Because of the unique finality of the death penalty, its imposition must be the result of careful procedures and must survive close scrutiny on post-trial review. I do not believe that this rigorous scrutiny is possible when, as here, procedural rules ultimately abandoned by the State are all that stand between the convicted individual and the chance to prove his claims.

Petitioner offered to call as witnesses the jurors, who, he alleged, would testify not merely to the atmosphere surrounding the trial, but to the actual effect of that atmosphere on their deliberations. The only obstacle to calling those witnesses was the State's failure to provide him with a means of serving compulsory process. In order to agree with petitioner that this failure amounts to a violation of the Due Process Clause, it would not be necessary to hold that compulsory process is constitutionally required in any other civil, or indeed, in any other habeas proceeding. It would instead be sufficient, as it was last Term in *Beck,* to recognize the unique character of the death penalty and of the restraints required by the Constitution before the State may impose it. Granting the assistance of compulsory process to an individual under sentence of death but ready and willing to demon-

strate the unconstitutionality of the manner of his conviction might well be among those restraints.[5] Accordingly, I would grant the petition for certiorari to consider that question.

JUSTICE REHNQUIST, dissenting.

Ordinarily I would have no hestitation joining the majority of my colleagues in denying the petition for certiorari in this case. The questions presented in the petition are of importance only to petitioner himself and therefore are not suitable candidates for the exercise of our discretionary jurisdiction. But in a larger sense, the case raises significant issues about the administration of capital punishment statutes in this country, and reflects the increasing tendency to postpone or delay the enforcement of those constitutionally valid statutes. Because I think stronger measures are called for than the mere denial of certiorari in a case such as this, I would grant the petition for certiorari so that the case can be fully briefed and argued.

A mere recital of the facts of this case illustrates the delay to which I have referred. Petitioner was convicted by a jury in 1973 of murdering six members of a family, after raping and torturing some members of that family. He was sentenced to death under Georgia's capital punishment statute, a statute expressly held constitutional in *Gregg* v. *Georgia*, 428 U. S. 153 (1976). The sentence was affirmed by the Supreme Court of Georgia, *Coleman* v. *State*, 237 Ga. 84, 226 S. E. 2d 911 (1976), and this Court denied the first petition for certiorari. *Coleman* v. *Georgia*, 431 U. S. 909, rehearing denied, 431 U. S. 961 (1977). Petitioner subse-

---

[5] Because Georgia law now permits service anywhere in the State, it cannot fairly be argued that requiring compulsory process to force witnesses to appear would be contrary to any state policy. It is no longer true, as the State asserts in its brief in opposition, that the 150-mile limit reflects a legislative determination concerning "the interests of sparing undue burdens to witnesses and of establishing realistic boundaries to the jurisdictional reach of the trial courts."

quently sought state collateral relief, which was denied by the state habeas court. The Georgia Supreme Court then denied his application for a writ of probable cause to appeal. Petitioner has now filed his second petition for certiorari in this Court. Because petitioner has had a full opportunity to have his claims considered on direct review by both the Supreme Court of Georgia and this Court and on collateral review by the state courts of Georgia, and because the issues presented are not substantial, it is not surprising that the majority of the Court votes to deny the petition for certiorari.

I dissent not because I believe that petitioner has made any showing in the Georgia courts that he was deprived of any rights secured to him by the United States Constitution, but rather because our mere denial of certiorari will not in all likelihood end the already protracted litigation in this case. If petitioner follows the path of many of his predecessors, he will now turn to a single-judge federal habeas court, alleging anew some or all of the reasons which he urges here for granting the petition for certiorari. If he fails to impress the particular United States District Court in which his habeas petition is filed, he may upon the issuance of a certificate of probable cause appeal to a United States Court of Appeals. And throughout this exhaustive appeal process, any single judge having jurisdiction over the case may of course stay the execution of the penalty pending further review. 28 U. S. C. § 1651. Given so many bites at the apple, the odds favor petitioner finding some court willing to vacate his death sentence because in its view his trial or sentence was not free from constitutional error. See *Estelle* v. *Jurek,* 450 U. S. 1014 (1981) (REHNQUIST, J., dissenting).

It seems to me that we have thus reached a stalemate in the administration of federal constitutional law. Although this Court has determined that capital punishment statutes do not violate the Constitution, *Gregg* v. *Georgia, supra,* and although 30-odd States have enacted such statutes, apparently in the belief that they constitute sound social policy, the ex-

istence of the death penalty in this country is virtually an
illusion. Since 1976, hundreds of juries have sentenced hun-
dreds of persons to death, presumably in the belief that the
death penalty in those circumstances is warranted, yet vir-
tually nothing happens except endlessly drawn out legal pro-
ceedings such as those adverted to above. Of the hundreds
of prisoners condemned to die who languish on the various
"death rows," few of them appear to face any imminent pros-
pect of their sentence being executed. Indeed, in the five
years since *Gregg* v. *Georgia,* there has been only one execu-
tion of a defendant who has persisted in his attack upon his
sentence. See *Spenkelink* v. *Wainwright,* 442 U. S. 1301
(1979) (REHNQUIST, J., in chambers). My in-chambers opin-
ion in that case describes some of the many avenues of relief
which can be pursued by one sentenced to death.

I do not think that this Court can continue to evade some
responsibility for this mockery of our criminal justice sys-
tem. Perhaps out of a desire to avoid even the possibility
of a "Bloody Assizes," this Court and the lower federal courts
have converted the constitutional limits upon imposition of
the death penalty by the States and the Federal Govern-
ment into arcane niceties which parallel the equity court
practices described in Charles Dickens' "Bleak House."
Even though we have upheld the constitutionality of capital
punishment statutes, I fear that by our recent actions we
have mistakenly sent a signal to the lower state and federal
courts that the actual imposition of the death sentence is to
be avoided at all costs.

That surely was not the intent of the opinion of JUSTICES
STEWART, POWELL, and STEVENS in *Gregg* v. *Georgia.* That
opinion recognized that capital punishment is said to serve
two principal social purposes—retribution and the deterrence
of capital crimes by prospective offenders. It went on to
explain:

> "The value of capital punishment as a deterrent of
> crime is a complex factual issue the resolution of which

properly rests with the legislatures, which can evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts. . . .

"In sum, we cannot say that the judgment of the Georgia Legislature that capital punishment may be necessary in some cases is clearly wrong. Considerations of federalism, as well as respect for the ability of a legislature to evaluate, in terms of its particular State, the moral consensus concerning the death penalty and its social utility as a sanction, require us to conclude, in the absence of more convincing evidence, that the infliction of death as a punishment for murder is not without justification and thus is not unconstitutionally severe." 428 U. S., at 186–187.[1]

What troubles me is that this Court, by constantly tinkering with the principles laid down in the five death penalty cases decided in 1976, together with the natural reluctance of state and federal habeas judges to rule against an inmate on death row, has made it virtually impossible for States to enforce with reasonable promptness their constitutionally valid capital punishment statutes. When society promises to punish by death certain criminal conduct, and then the courts fail to do so, the courts not only lessen the deterrent effect of the threat of capital punishment, they undermine the integrity of the entire criminal justice system. To be

---

[1] That same opinion once again rejected the argument that evolving "standards of decency" demand the end of the death penalty, as if the role of judges, as opposed to democratically elected legislatures, is to "divine" what are "decent" societal values. The opinion made clear that recent developments—such as the enactment of capital punishment statutes by 35 States—had undercut that argument. "Despite the continuing debate, dating back to the 19th century, over the morality and utility of capital punishment, it is now evident that a large proportion of American society continues to regard it as an appropriate and necessary criminal sanction." 428 U. S., at 179–180.

sure, the importance of procedural protections to an accused should not be minimized, particularly in light of the irreversibility of the death sentence. But it seems to me that when this Court surrounds capital defendants with numerous procedural protections unheard of for other crimes and then pristinely denies a petition for certiorari in a case such as this, it in effect all but prevents the States from imposing a death sentence on a defendant who has been fairly tried by a jury of peers. As Justice Jackson stated in *Stein* v. *New York,* 346 U. S. 156, 197 (1953): "The petitioners have had fair trial and fair review. The people of the State are also entitled to due process of law."

The other principal purpose of capital punishment is retribution. The testimony of Lord Justice Denning, then Master of the Rolls of the Court of Appeal in England, before the Royal Commission on Capital Punishment answers those who insist that respect for the "sanctity of life" compels the end of the death sentence for any crime, no matter how heinous. He explained:

> "Punishment is the way in which society expresses its denunciation of wrong doing: and, in order to maintain respect for law, it is essential that the punishment inflicted for grave crimes should adequately reflect the revulsion felt by the great majority of citizens for them. It is a mistake to consider the objects of punishment as being deterrent or reformative or preventive and nothing else. . . . The truth is that some crimes are so outrageous that society insists on adequate punishment, because the wrong-doer deserves it, irrespective of whether it is a deterrent or not." Royal Commission on Capital Punishment, Minutes of Evidence, Dec. 1, 1949, p. 207 (1950), quoted in *Gregg* v. *Georgia,* 428 U. S., at 184, n. 30.

There can be little doubt that delay in the enforcement of capital punishment frustrates the purpose of retribution. As

the opinion in *Gregg* stated, " '[w]hen people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they "deserve" then there are sown the seeds of anarchy—of self-help, vigilante justice, and lynch law.' " *Id.*, at 183, quoting *Furman* v. *Georgia*, 408 U. S. 238, 308 (1972) (STEWART, J., concurring). San Francisco experienced vigilante justice during the Gold Rush in the middle part of the last century; the mining towns of Montana experienced it a short time later; and it is still with us as a result of the series of unsolved slayings of Negro children in Atlanta.[2]

In thinking about capital punishment, it is important to remember that the preservation of some degree of liberty for all demands that government restrain the few who kill law-abiding members of the community. As Judge Learned Hand long ago recognized:

> "And what is this liberty which must lie in the hearts of men and women? It is not the ruthless, the unbridled will; it is not freedom to do as one likes. That is the denial of liberty, and leads straight to its overthrow. A society in which men recognize no check upon their freedom soon becomes a society where freedom is the

---

[2] A recent article in the Washington Star, Mar. 21, 1981, p. 1, cols. 3–4, illustrates this growing problem. It reads:

"ATLANTA (AP)—Two gun-wielding men were arrested yesterday at the start of a housing project's self-defense patrol to protect youngsters against Atlanta's child killers.

"Younger members of the patrol, who carried baseball bats, were not stopped but those carrying weapons were questioned by police. The two arrested were charged with possession of deadly weapons at a public gathering. . . .

"Israel Green, who heads the project's tenants' association, called for national support of the patrol's right to carry arms.

" 'We cannot stop them (killers) by consulting psychics, by having seances, by prayer vigils or by lighting little candles or forms of distracting activity that is not directly connected to the problems we face,' Green said in a statement. 'We have to face these killers in the real world.' "

possession of only a savage few; as we have learned to our sorrow." The Spirit of Liberty 190 (3d ed. 1960).

James Madison made the same point in this now famous passage from Federalist Paper No. 51:

"But what is government itself but the greatest of all reflections on human nature? If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: *you must first enable the government to control the governed;* and in the next place oblige it to control itself." The Federalist Papers 322 (1961). (Emphasis supplied.)

I believe we have in our judicial decisions focused so much on controlling the government that we have lost sight of the equally important objective of enabling the government to control the governed. When our systems of administering criminal justice cannot provide security to our people in the streets or in their homes, we are rapidly approaching the state of savagery which Learned Hand describes. In Atlanta, we cannot protect our small children at play. In the Nation's Capital, law enforcement authorities cannot protect the lives of employees of this very Court who live four blocks from the building in which we sit and deliberate the constitutionality of capital punishment.[3]

---

[3] When the issue of capital punishment arises, one is reminded of Judge Parker, a well-known judge who sat in the Western District of Arkansas for more than 20 years, and had to deal with the outlaws of his time and place. He had earned the reputation of a "hanging judge." Of the several biographies written of him, J. Gregory & R. Strictland, Hell on the Border 28 (1971) makes the following statement:

"It did not seem to Judge Parker to be an act of cruelty to sentence such blood-thirsty men to die. 'I never hanged a man,' he said when lying on his death bed, 'I never hanged a man. It is the law. The good ladies who carry flowers and jellies to criminals mean well. There is no

In light of the foregoing, I do not believe it is a responsible exercise of our certiorari jurisdiction to blithely deny petitions for certiorari in cases where petitioners have been sentenced to death and present for review claims which seem on their face to have little merit, and which have been extensively considered by state and federal courts on both direct and collateral review. The 5-year history of death sentences, as opposed to execution of those sentences, is a matter with respect to which no Member of this Court can be unaware. If capital punishment is indeed constitutional when imposed for the taking of the life of another human being, we cannot responsibly discharge our duty by pristinely denying a petition such as this, realizing full well that our action will simply further protract the litigation.

Accordingly, I believe that the petition should be granted in order that this Court may deal with all of petitioner's claims on their merits. If after full briefing and argument the Court decides to affirm, the provisions of 28 U. S. C. § 2244 (c) would come into operation. That section provides in pertinent part:

> "In a habeas corpus proceeding brought in behalf of a person in custody pursuant to the judgment of a State court, a prior judgment of the Supreme Court of the United States on an appeal or review by a writ of certiorari at the instance of the prisoner of the decision of such State court, shall be conclusive as to all issues of fact or law with respect to an asserted denial of a Federal right which constitutes ground for discharge in a habeas corpus proceeding, actually adjudicated by the Supreme Court therein . . . ."

See *Neil* v. *Biggers,* 409 U. S. 188 (1972).

---

doubt of that, but what mistaken goodness! Back of the sentimentality are the motives of sincere pity and charity, sadly misdirected. They see the convict alone, perhaps chained in his cell; they forget the crime he perpetrated and the family he made husbandless and fatherless by his assassin work.' "

964

Thus the jurisdiction of the federal courts over petitioner's sentence of death would be at an end, and unless the appropriate state officials commuted petitioner's sentence, it would presumably be carried out. In any event, the decision would then be in the hands of the State which had initially imposed the death penalty, not in the hands of the federal courts.